**William J. CAROTHERS, et al., Plaintiffs,**

v.

**William J. McCARTHY, et al., Defendants.**

**Civ. A. No. 88–2773.**

United States District Court, District of Columbia.

Feb. 7, 1989.

Paul Alan Levy, Alan B. Morrison, Arthur L. Fox II, Public Citizen Litigation Group, Christine Allamanno, Teamsters for a Democratic Union, Washington, D.C., for plaintiffs.

Gary Witlen, Office of General Counsel, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

This case presents a number of interesting and important questions concerning the scope of union members' rights to comment and vote upon collective bargaining agreements that affect the terms and conditions

of their employment. Those questions are now before the Court by means of the parties' cross-motions for summary judgment. For the reasons outlined below, these motions will be granted in part and denied in part.

## I. Background

The union involved in this case is the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Union or Teamsters), a national labor organization with its headquarters in Washington, D.C. The union members whose rights are at stake belong to the Teamsters for a Democratic Union (TDU), a rank-and-file organization that seeks to "reform and democratize" the Union in order to make it "a more effective collective bargaining representative." Complaint ¶ 9. The collective bargaining agreement at issue is known as the National Automobile Transporters Agreement (NATA or carhaul contract). Our court of appeals recently described the relevant features of the carhaul contract:

> The NATA is a multi-employer collective bargaining agreement that governs relations between 100 Teamsters locals and 39 employers. It consists of a master agreement setting certain wages and working conditions on a nationwide basis, and a series of supplemental agreements establishing certain terms of employment by region and job classification. The contract is normally negotiated at three-year intervals by the Teamsters' negotiating committee, which, in accordance with the Union constitution, submits negotiated agreements to the entire national membership for ratification. Under the Union's interpretation of its constitution—upheld against legal challenge in *Davey v. Fitzsimmons*, 413 F.Supp. 670 (D.D.C.1976)—the master agreement and all supplements are voted on by the entire membership as a single package. The Union's usual practice, however, is to send each member a ballot package containing only the master agreement and the one supplemental agreement governing that member's region and job classification.

*Carothers v. Presser*, 818 F.2d 926, 928 (D.C.Cir.1987).

The procedures governing ratification of the NATA are the focus of this action. In the usual case, the Union calls a meeting of representatives from affected locals to discuss collective bargaining agreements that have been negotiated with management. If the representatives vote to approve the agreement, they return to their locals and arrange meetings at which the proposed contract is explained and discussed. Some time after these local meetings are held, the Union conducts the official vote on the contract by mailing ballots, a copy of the proposed agreement and relevant supplements to affected members. The members vote by mailing the ballots back to the Union. *See Bauman v. Presser*, 117 LRRM 2393, 2394 (D.D.C.1984) [1984 WL 3255], *appeal dismissed as moot*, 119 LRRM 2247 (D.C.Cir.1985).

Shortly after its existing carhaul contract expired on July 1, 1988, the Teamsters leadership negotiated a tentative agreement on a new contract that would extend until March 1991. In accordance with its usual procedures, the Union summoned representatives of affected locals to a meeting in Chicago on July 6, 1988; the representatives voted to approve the contract. In a departure from standard practice, however, members did not vote on the contract by mail. Rather, the Union sent each member a copy of the proposed collective bargaining agreement on July 8, 1988 and meetings were held approximately two weeks later, on July 23 through July 26, 1988. At these meetings, the new contract was explained to and discussed by members, who then cast their ballots in secret. The proposed agreement was rejected by 72% of the Union members who voted. *See* Affidavit of Walter J. Shea, submitted with Defendants' Motion for Summary Judgment (Shea Aff.), at 2–3; Complaint ¶ 10.

The Teamsters negotiators returned to the bargaining table and reached a tentative agreement on a new carhaul contract in September 1988. Union representatives were called to a meeting on September 22, 1988 to consider the new agreement and

again recommended in favor of approval. Reverting to its usual practice, the Union decided to hold explanatory local meetings and conduct a vote by mail, but it established an accelerated schedule for doing so. The meetings were scheduled for the weekend of September 24 and 25, and ballots were due to be mailed on September 28, 1988. Shea Aff. at 5; Complaint ¶¶ 11, 18.

On September 26, 1988—after the weekend meetings were held but before the ballots were due to be mailed—two members of TDU, William J. Carothers and Dennis A. Wade, filed this suit naming as defendants the Teamsters and its International President, William J. McCarthy.[1] The complaint contended that certain actions taken by defendants during ratification of the carhaul contract violated plaintiffs' rights to a meaningful vote and to free speech guaranteed under Title I of the Labor–Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. §§ 401 *et seq.*, and amounted to a breach of the duty of fair representation owed by the Union to its members. Three actions were cited in the complaint: (1) defendants' refusal to provide to plaintiffs the text of changes to the carhaul contract at the same time that this information was disclosed to union representatives on September 22, 1988; (2) the short period of time between the meeting of local representatives on September 22, 1988 and the scheduled mailing of ballots on September 28, 1988; and (3) attempts by Union officials to prevent members from passing resolutions expressing their views on the contract at the weekend meetings. In addition to a declaratory judgment, plaintiffs sought (1) injunctive relief enjoining defendants from mailing ballots until at least 10 days after they (plaintiffs) had received a copy of the proposed agreement; (2) an order compelling defendants to provide copies of all future carhaul contracts to plaintiffs once it had been given to local Union representatives; and (3) and injunctive relief that would preclude defendants from interfering with members seeking to pass resolutions expressing their views at local meetings and compel them to notify local unions that their members were free to do so. Complaint at 9–10.

Simultaneously with the filing of their complaint, plaintiffs moved for a temporary restraining order. Acting in his capacity as motions judge, Judge Royce Lamberth held a hearing on September 27, 1988 and granted plaintiffs' motion for temporary relief in part, enjoining the Union from mailing the ballots until October 3, 1988.[2] After the ballots were mailed and returned to the Union, the contract was ratified by a vote of 9,034 to 4,498. The parties' cross-motions for summary judgment then followed.

## II. LMRDA Claims

Subsections 101(a)(1) and 101(a)(2) of Title I of LMRDA provide:

(a)(1) Equal rights. Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) Freedom of speech and assembly. Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor

---

**1.** For simplicity, the Court will refer to these parties collectively as "defendants" or "the Union."

**2.** Plaintiffs' other request for temporary relief (an order compelling defendants to notify the Union's locals that members were free to pass resolutions at explanatory meetings) was denied.

organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(1) & (2).

The Supreme Court has noted that LMRDA was "the product of congressional concern with widespread abuses of power by union leadership." *Finnegan v. Leu,* 456 U.S. 431, 435, 102 S.Ct. 1867, 1870, 72 L.Ed.2d 239 (1982). Using the Bill of Rights as its model, Congress enacted Title I of LMRDA "to guarantee every member equal voting rights, rights of free speech and assembly, and a right to sue." *Sheet Metal Workers' International Association v. Lynn,* — U.S. —, —, 109 S.Ct. 639, 643–44, 102 L.Ed.2d 700 (1989) (quoting *United Steelworkers of America v. Sadlowski,* 457 U.S. 102, 109, 102 S.Ct. 2339, 2344, 72 L.Ed.2d 707 (1982)). These provisions, as the Supreme Court recently recognized, are designed "to protect free speech and assembly rights because these are considered 'vital to the independence of the membership and the effective and fair operation of the union as the representative.'" *Reed v. United Transportation Union,* — U.S. —, —, 109 S.Ct. 621, 625–26, 102 L.Ed.2d 665 (1989) (quoting *Hall v. Cole,* 412 U.S. 1, 8, 93 S.Ct. 1943, 1947, 36 L.Ed.2d 702 (1973)). In short, the Act seeks to "ensur[e] that unions [are] democratically governed and responsive to the will of their memberships." *Finnegan,* 456 U.S. at 436, 102 S.Ct. at 1870.

Notwithstanding these lofty pronouncements, subsections 101(a)(1) and 101(a)(2) are not without limitation. As Judge Edwards recently observed in *Carothers v. Presser,* 818 F.2d 926 (D.C.Cir.1987):

Title I of the LMRDA is not a mandate for courts to impose on labor unions whatever procedures or practices they regard as "democratic." Although the enactment of Title I was certainly propelled by a congressional intent to broaden the democractic features of union governance, Congress did not embrace an amorphous and boundless notion of democracy. Rather, it enumerated specific rights designed to ensure that unions adhere to certain basic democratic principles. Those principles must be gleaned from the statute itself; they may not be derived from a court's perception of what union procedures are necessary to guarantee a "fully informed vote."

818 F.2d at 934. *Carothers* also identified the proper role for a court faced with a Title I claim:

First and foremost, the court must determine whether the union's conduct deprived the plaintiffs of a right *specifically enumerated* in the statute, such as the right to an equal vote, found in subsection 101(a)(1), or the right to "express any views, arguments, or opinions," found in subsection 101(a)(2). Once it has made a *particularized finding* that the union violated a right specifically enumerated in the statute, the court may fashion a remedy tailored to the violation.

*Id.* at 931 (emphasis in original).

In the instant case, plaintiffs assert that their right to an equal vote under section 101(a)(1) and their right to express their views under section 101(a)(2) were violated during the ratification process. As noted above, they contend that defendants committed these violations by withholding information from them about the NATA negotiated in September 1988 at the time of the September 22, 1988 meeting of local representatives; by conducting an accelerated vote on the contract; and by preventing members from passing resolutions at explanatory meetings about the contract. Each of these claims will be examined in turn.

A.  Withholding of Information

Plaintiffs first contend that their right to an equal vote under subsection 101(a)(1) was infringed when they were denied access to complete information about the carhaul contract at the same time that it was disclosed to local union representatives on September 22, 1988.

■ The right to vote guaranteed by subsection 101(a)(1) is not absolute. This provision, according to the Supreme Court, "is no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote." *Calhoon v. Harvey*, 379 U.S. 134, 139, 85 S.Ct. 292, 295, 13 L.Ed.2d 190 (1964). *See also American Postal Workers Union v. American Postal Workers Union*, 665 F.2d 1096, 1101 (D.C.Cir. 1981) ("This provision itself accords no voting rights to a union membership, but it does mandate that rights given to some members be available to all"). In *Bunz v. Moving Picture Machine Operators' Protective Union*, 567 F.2d 1117 (D.C.Cir. 1977), however, our court of appeals "refused to take an unreasonably narrow view of the right to an equal vote." *Mallick v. International Brotherhood of Electrical Workers*, 749 F.2d 771, 786 (D.C.Cir.1984). Writing for the court in *Bunz*, Judge Wilkey observed:

A union's discrimination against its members is most obvious, of course, when it denies some of them the right to vote outright. However, a union cannot immunize itself against charges of discrimination simply by affording each member the "mere naked right to cast a ballot;" the right each member has to vote must be "meaningful." Accordingly, the courts have found that the "equal right to vote" was denied, notwithstanding universal suffrage, where union officials circulated inadequate or misleading information about matters to be voted upon ...

567 F.2d at 1121 (footnotes omitted).

■ It is clear that plaintiffs were denied access to complete information about the contents of the carhaul contract when they requested it. Upon learning that a new agreement had been negotiated in September 1988, TDU's counsel, Christine Allamanno, pressed union officials on September 20–22, 1988 to obtain the text of the new agreement and its supplements but her efforts were rebuffed. Affidavit of Christine Allamanno, submitted with Plaintiffs' Motion for A Temporary Restraining Order (Allamanno Aff.), ¶¶ 6–10. Similarly,

another attorney for plaintiffs, Paul Alan Levy, requested the same information from the Teamsters' General Counsel; he was told that plaintiffs should "attend their local union meeting over the weekend and direct any questions they have to their duly authorized bargaining representative." Affidavit of Paul Alan Levy, submitted with Plaintiffs' Motion for a Temporary Restraining Order (First Levy Aff.), Exhibit D. Finally, when plaintiff Carothers followed this advice and asked the President of his local, Ron Owens, on September 23, 1988 for the language of the changes that had been recently negotiated, Owens refused to provide the information. Affidavit of William J. Carothers, submitted with Plaintiffs' Motion for a Temporary Restraining Order (First Carothers Aff.), ¶ 14. These refusals—none of which are disputed by defendants—were taken despite the fact that the Union had given plaintiffs the text of the carhaul agreement that it had negotiated with management in July 1988, and had done so *at the same time* that it had disclosed the information to its local union representatives. *See* Allamanno Aff. ¶ 2 & Exhibit A; First Carothers Aff. ¶ 11. The Union had also given details of the NATA negotiated in August 1985 to members of the Teamsters on the same day that it was provided to local representatives. First Levy Aff. ¶ 2 & Exhibit A.

Moreover, the same type of information which was withheld from plaintiffs has been recently provided to other Teamsters members. In settlement of a lawsuit challenging ratification of its agreements with United Parcel Service, Inc., the Union agreed in June 1988 to provide copies of all future national agreements and their supplements and to do so "immediately following the meeting at which the proposed agreement is accepted by representatives of the local unions." First Levy Aff., Exhibit B, ¶ 1. In April 1988, the Union made similar disclosures to Teamsters members seeking to obtain all of the supplements to the National Master Freight Agreement. Affidavit of Paul Alan Levy, submitted with Plaintiffs' Motion for Summary Judgment, Exhibit H. And the Union has also

agreed to provide complete copies of the National Signal Delivery Service Agreement to Teamsters members in response to recent litigation filed in this District. *See Riley v. McCarthy,* No. 88–3157.

The Union's refusal to provide plaintiffs with the changes negotiated to the carhaul contract at the same time that this information was given to local union representatives is more than sufficient to bring this case within the parameters of *Bunz,* where the court of appeals stated that "inadequate or misleading information about the matters to be voted upon" could constitute denial of a right to a meaningful vote. 567 F.2d at 1121. And it is consistent with language from numerous other cases that have also addressed the right of a union member to cast and informed and meaningful vote.[3] While plaintiffs' argument can stand on its own, it is also bolstered by the fact that similar information had been imparted to plaintiffs in the past and to other Teamster members with respect to other contracts.

Defendants admit that "[t]his Circuit has recognized that the type of discriminatory conduct necessary to trigger a § 101(a)(1) violation need not be so blatant as to directly interfere with the mechanics of voting." Defendants' Motion for Summary Judgment at 16–17. They seek to sidestep the force of *Bunz* by relying on two more recent decisions by the court of appeals. Citing *Mallick v. International Brotherhood of Electrical Workers,* 749 F.2d 771 (D.C.Cir.1984), they claim that no violation of LMRDA occurs "merely because a member is not granted access to all of the information which he or she deems necessary to cast an informed vote." Defendants' Motion for Summary Judgment at 17. And defendants maintain that *Carothers v. Presser* rejected the notion that "the democratic purpose of the LMRDA must be accomplished by judicially creating rights

where none statutorily exist." *Id.* Defendants argue that no discrimination occurred because plaintiffs were provided the carhaul changes at the same time as every other affected member.

Although defendants accurately state the conclusions reached by the court of appeals in *Mallick* and *Carothers,* neither case alters the conclusion reached above. *Mallick* involved a member who sought access to his union's books and records in order to ascertain the expenditures it incurred in defending a separate lawsuit. The member claimed that the union violated his rights to an equal vote and free speech under LMRDA when it refused to release this material. The court of appeals disagreed. Noting the broad definition of the equal right to vote announced in *Bunz,* it pointed out that "Mallick's claim is outside even a very broad view of the statute." 749 F.2d at 786. And because Mallick had simply asserted that the information in the Union's books was "essential to informed participation in union politics," *id.,* his free speech claim was similarly defective, since the Court noted that "[t]hat right does not guarantee access to all information a member might want to speak about." *Id.*

Here, by contrast, plaintiffs do not assert a vague and undefined need for access to documents simply in order to investigate a matter of concern to them. Rather, they sought information in order to be able to cast a meaningful vote on "a referendum of [their] labor organization," 29 U.S.C. § 411(a)(1), a referendum offered by the Union in order to approve a three-year contract that would affect the terms and conditions of their day-to-day employment. Unlike Mallick, plaintiffs have "ground[ed] [their] claims on a violation of a specific right enumerated in subsection 101(a)." 749 F.2d at 786.

---

**3.** *See, e.g., Bauman,* 117 LRRM at 2399 ("members must have the opportunity to attempt to persuade their fellow members to reject or support a proposal"); *Gilliam v. Independent Steelworkers Union,* 572 F.Supp. 168, 171 (N.D.W.Va. 1983) (members must be able "to mount effective support or opposition to the leadership's position"); *Blanchard v. Johnson,* 388 F.Supp.

208, 214 (N.D.Ohio 1974), *affirmed,* 532 F.2d 1074 (6th Cir.), *cert. denied,* 429 U.S. 834, 869, 97 S.Ct. 100, 180, 50 L.Ed.2d 100, 149 (1976) (section 101(a)(1) is designed to assure that "the lines of communication and dissemination of views and opinions are kept open and working").

Nor does *Carothers* suggest a different result. In that case, the plaintiffs (who are also the plaintiffs in this action) demanded access to the Teamsters' mailing list in order to communicate their expected opposition to the 1985 version of the carhaul contract. After the Union rejected their request, the plaintiffs asserted that their rights to an equal vote and to free speech had been transgressed. Concluding that "the right of access to the mailing list may be found" under subsections 101(a)(1) and 101(a)(2), Judge Gasch entered summary judgment in favor of plaintiffs. 636 F.Supp. 817, 827 (D.D.C.1986). The court of appeals reversed. It noted, without comment, that Judge Gasch had interpreted prior decisions, including *Bunz,* to find a right to a meaningful vote within the right to an equal vote under subsection 101(a)(1). The error it identified, however, was the trial court's failure "to consider whether the evidence in the record supported a finding that the Union's denial of access had somehow deprived the [plaintiffs] of a 'meaningful' vote." 818 F.2d at 932. Similarly, while the court of appeals approved of Judge Gasch's construction of section 101(a)(2), *id.* n. 13, he was faulted for not making "a particularized finding that the Union's denial of access under the circumstances of this case deprived the [plaintiffs] of an opportunity to 'communicate effectively' with the Union membership." 818 F.2d at 932. These failures to identify the specific harms suffered by the plaintiffs led the district court, in effect, to "create[ ] an absolute right of access to a mailing list under section 101(a) in favor of any dissi-

dent Union member who expresses an interest in commenting on a contract submitted to the membership for ratification." 818 F.2d at 933.[4]

While the court in *Carothers* therefore held that a violation of Title I was not possible without a particularized finding that the challenged conduct diminished the member's rights in some fashion, it also made clear that entry of such a finding would enable a court to fashion a precise remedy appropriate to the violation.[5] In the instant case, this Court can make the particularized finding required by *Carothers* without hesitation. As noted above, when the meeting of Union local representatives approved the carhaul contract on September 22, 1988, plaintiffs asked for but were not given the text of the agreement or its supplements by the Union.[6] Local meetings were held just two days later, on September 24 and 25, 1988. Plaintiffs have explained that at these meetings "members develop their basic impression of the contract and begin to make up their minds." Plaintiffs' Motion for Summary Judgment, Affidavit of William J. Carothers, ¶ 8.[7] Because of the size of the carhaul agreement and its supplements, members depend on Union officers who favor the contract, and those like plaintiffs who may oppose it, to examine the negotiated changes and make a recommendation about ratification. First Carothers Aff. ¶ 7. Plaintiffs have found that, when Union representatives discuss a particular provision of the contract, it is important to be able to distribute a written leaflet to members con-

4. The district court's inability in *Carothers* to tie the conduct at issue to specific violations of rights may have been a product of plaintiffs' litigation strategy. *See* 818 F.2d at 933 n. 16 ("In the instant case, the appellees [plaintiffs] did not attempt to build a factual record at the trial court level sufficient to demonstrate a violation of a right specifically enumerated in the LMRDA").

5. *See* 818 F.2d at 931 ("Once it has made a *particularized finding* that the union violated a right specifically enumerated in the statute, the court may fashion a remedy tailored to the violation") (emphasis in original); *id.* at 935 n. 18 ("we have no occasion to examine the circumstances in which a union's denial of access

to its mailing list might *contribute to* a violation of a right specifically enumerated in the statute") (emphasis in original).

6. As noted above, that refusal was taken even though plaintiffs had been given the same information in the past and even though other Teamster members had received similar materials with respect to other contracts.

7. Although they disagree with plaintiffs' contentions that release of the carhaul contract changes prior to the meetings is desirable and that members should be allowed to present resolutions at the meetings, defendants themselves acknowledge the importance of the meetings in the voting process. Shea Aff. at 5–7.

taining the plaintiffs' view of the proposal. *Id.* ¶ 8. With so little time between the approval of the contract and the explanatory meetings, and without a copy of the changes negotiated by the Union, however, plaintiffs were forced to distribute a leaflet that contained incomplete information gathered from second-hand sources. *Id.* ¶¶ 9, 16. Thus, because " 'the lines of communication among the membership [were not] as unfettered as reason can make them,' " *Bunz,* 567 F.2d at 1121 n. 22 (quoting *Blanchard,* 388 F.Supp. at 216), and because defendants were willing to provide contract changes to their local representatives and to other union members but not to plaintiffs, the Court finds that plaintiffs were deprived of their right to a meaningful vote under subsection 101(a)(1).[8]

■ A finding that the right to an equal vote has been denied does not, however, automatically establish entitlement to relief under Title I of LMRDA. Subsection 101(a)(1) contains a proviso that subjects the rights guaranteed to "reasonable rules and regulations in [the union's] constitution and by-laws." *See, e.g., Sadlowski,* 457 U.S. at 115–19, 102 S.Ct. at 2347–49; *American Postal Workers,* 665 F.2d at 1102–05. Defendants assert that their decision to withhold information from plaintiffs is justified by their "legitimate interest in ensuring that members attend union meetings to discuss contract proposals to receive accurate information before they vote." Motion at 18–19. To prove their point, they rely on the affidavit of Walter Shea, a vice-president of the Union and a co-chairman of the committee that negotiated the carhaul contract, who described why union representatives were not allowed to provide members with copies of the contract before the explanatory meetings:

> The reason for this was that experience has demonstrated that a larger number of members attend a membership meeting when they do not have all of the information about a collective bargaining agreement in advance. When they have the information prior to the meeting, many members do not attend the meeting at which the contract is to be explained and discussed.

Shea Aff. at 5–6. Shea also asserts that local leaders were told not to discuss the NATA with members of the news media because, "[b]ased on prior experience," such disclosure "often results in inaccurate reporting, or at best selective reporting, of contract terms" and because "many members are resentful of the fact that they learn about the contract from the news media rather than union officials." *Id.* at 5.

These arguments are rejected for several reasons. For one thing, defendants' justification is just that—a justification offered during the course of this litigation. It is neither a "rule" nor a "regulation," and it is not found within the Union's constitution or bylaws nor is it memorialized in any other way.[9] If the restriction imposed on plaintiffs was in fact a hard-and-fast rule, it seems odd that defendants would have selectively violated it by providing plain-

---

**8.** In reaching this determination, the Court does not mean to suggest, nor have plaintiffs contended, that defendants are obliged to provide *every* member of the Union with a copy of the carhaul contract and all of its supplements. Where, however, as here, a member requests that information in order to be able to vote on a contract affecting the terms and conditions of his employment, section 101(a) is violated if that material is refused.

Although neither party has cited it, a separate provision of LMRDA, 29 U.S.C. § 414, imposes a "duty" on unions to "forward a copy of each collective bargaining agreement made by such [union] to any employee who requests such a copy and whose rights as such employee are directly affected by such agreement." While it is doubtful that proposed contracts would come within the meaning of "collective bargaining agreement" (that term is not defined within the statute, *see* 29 U.S.C. § 402), and although it appears that the sole remedy for a violation of this provision is a civil action by the Secretary of Labor under 29 U.S.C. § 440, this section is nevertheless indicative of a Congressional intent to assure member access to the information contained in these critical documents.

**9.** *See, e.g., Maceira v. Pagan,* 649 F.2d 8, 16 (1st Cir.1981) (member improperly disciplined for holding unauthorized press conference when he had already done so in the past and where no rule or practice compelled him to obtain prior authorization). *Compare American Postal Workers,* 665 F.2d at 1103 (union constitution asserted as restriction on members' rights).

tiffs with the carhaul contract text in 1985 and in July 1988 and by providing similar information to other Union members on recent occasions.

Moreover, a union seeking to show that its rule or regulation was reasonable bears the burden of proof on this score, *see Kuebler v. Cleveland Lithographers & Photoengravers Union,* 473 F.2d 359, 363 (6th Cir.1973), and the evidence supporting defendants' justification is meager at best. Mr. Shea's concerns that disclosure of information cause inaccurate media reporting and lower member attendance at explanatory meetings are supported only by his vague invocation of "past experience." Inasmuch as contract terms have been made available prior to the meetings on several occasions in the past, defendants' inability to cite a single instance of inaccurate media disclosure or a specific meeting with decreased attendance resulting from disclosure of contract terms is rather surprising. If union leaders could recite unsubstantiated "past experience" as the basis for restricting the rights of their members, *any* rule could readily be justified.

Finally, even were these infirmities cast aside, defendants' arguments fail to persuade the Court that "the antidemocratic effects of the [decision to withhold information] outweigh the interests urged in its support." *United Steelworkers v. Usery,* 429 U.S. 305, 311, 97 S.Ct. 611, 615, 50 L.Ed.2d 502 (1977). In essence, defendants seek to bolster their conduct here by a variant of Gresham's law in which *less* information would produce a more accurate and informed vote. That position, however, is contrary to common sense, has been resoundingly rejected by the Supreme Court in numerous cases arising under the First Amendment,[10] and is contradicted by evidence submitted by plaintiffs that attendance at the July meetings (when the contract information was available) was *higher* than at the September meetings.[11] This Court cannot adopt such a dubious proposition, and therefore finds that the Union's action in this case did not amount to the type of reasonable rule or regulation that would justify denial of plaintiffs' right to a meaningful vote.

**B. "Quickie Voting"**

Plaintiffs also alleged in the complaint that their right to a meaningful vote had been infringed by the short time span— only six days—that was permitted between approval of the contract on September 22, 1988 and the scheduled mailing of the ballots to members on September 28, 1988. Defendants counter by arguing that this issue is now moot because plaintiffs obtained a temporary restraining order extending the date for mailing the ballots for an additional five days until October 3, 1988. In their reply, plaintiffs essentially concede this point:

> Because Judge Lamberth granted a temporary restraining order extending the

**10.** In holding that "a zeal to protect the public from 'too much information' could not withstand First Amendment scrutiny," *Meese v. Keene,* 481 U.S. 465, 107 S.Ct. 1862, 1872, 95 L.Ed.2d 415 (1987), the Court in *Virginia Pharmacy Board v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), stated that:

> There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them.

425 U.S. at 770, 96 S.Ct. at 1829. Or as Justice Brandeis put it in *Whitney v. California,* 274 U.S. 357, 377, 47 S.Ct. 641, 648, 71 L.Ed. 1095

(1927), "[i]f there be time to expose through discussion the falsehood and fallacies, to avert the evil by the process of education, the remedy to be applied is more speech, not enforced silence."

**11.** *See* Plaintiffs' Motion for Summary Judgment, Affidavits of John M. Raffiani, Sr. at ¶ 2 and Joseph Flynn at ¶ 3. Although defendants attempt to explain this disparity by arguing that the July meetings were combined with a vote and the September meetings were not, *see* Defendants' Motion for Summary Judgment, Declarations of Howard Bennett at 3 and Frank E. Pendleton at 1, it still undercuts their position that more members will attend when they do not know the details of the proposal under consideration.

time of the balloting, and because we recognize that there may be some circumstances requiring that balloting be conducted immediately, we do not seek at this time any injunctive relief on the issue of the time allowed between announcement of the contract and beginning of the balloting. We seek relief only on the issues of the locals' right to pass resolutions and members' rights to see the full contract immediately following disclosure to the local union representatives.

Reply Brief at 11 n. 7. Accordingly, the "quickie voting" portion of this case is now moot.

## C. Passing Resolutions

Lastly, plaintiffs allege that their rights under LMRDA were transgressed because they were prevented from passing resolutions recommending in favor of or against the carhaul contract at the September meetings.[12] These resolutions are important, according to plaintiffs, because they allow members in one Union local to communicate their views on the Union's proposals to distant members around the country, who are not likely to be aware of the specific agreements that affect members elsewhere. First Carothers Aff. ¶ 18–20.[13] Plaintiffs claim that the Union instructed local representatives on two occasions to refuse to entertain any resolutions on the contract. *See* Exhibits F & G to First Levy Aff.

■ Notwithstanding the importance which they attach to the resolutions, plaintiffs have failed to prove that their rights under LMRDA to a meaningful vote or to free speech were violated.[14] As noted above, the critical component of Title I LMRDA claim is a "particularized finding that the Union's [refusal to allow voting] under the circumstances of this case deprived the [plaintiffs] of an opportunity to 'communicate effectively' with the Union membership." *Carothers,* 818 F.2d at 932. Unlike their inability to obtain information about the carhaul proposal—which prevented the distribution of complete leaflets and which was undertaken in a discriminatory manner, plaintiffs have not demonstrated how their inability to pass resolutions harmed their rights here. For one thing, defendants' affiants have made clear, and plaintiffs do not deny, that no Union members were precluded from asking questions about and discussing the details of the proposed contract at the September meetings.[15] While they may have had inadequate information about the contract, they were clearly free to express their views to one another and to try to obtain more information about it. Moreover, nothing prevented Union members opposing the contract from holding their own straw votes at another location after the explanatory meetings were held, *see* Shea Aff. at 6; the results of these informal votes could then have been communicated to other locals around the country. Plaintiffs' argument about the effectiveness of passing resolutions is also wanting for the same reason as defendants' justification of their refusal to provide information: it is based solely on a *post hoc* appraisal that is lacking in specificity.[16] Additionally, plaintiffs have not identified any specific harm that has accrued in this case. Although affidavits have been obtained from members who wished to *pass* resolutions, no evidence has been offered from any local member who

---

**12.** Defendants do not dispute ·that plaintiffs were precluded from taking "straw polls" at the September meetings. Shea Aff. at 6.

**13.** Union members only receive those NATA supplements that directly apply to them. *Carothers,* 818 F.2d at 928.

**14.** Because of this disposition, the Court need not address defendants' arguments that this claim should be rejected on mootness grounds and for failure to join the local unions under Fed.R.Civ.P. 19(a).

**15.** Defendants' Motion for Summary Judgment, Declarations of Howard Bennett at 2–3, James Cerone at 2, and Frank E. Pendleton at 2.

**16.** Plaintiff Carothers states that the resolutions "have been used" in the past but provides no examples. First Carothers Aff. ¶ 18.

wished to *receive* these resolutions. Without that evidence, it is impossible to determine if their inability to pass resolutions actually caused any harm. And, unlike the Union's discriminatory refusal to provide contract terms, plaintiffs have not demonstrated that any other members were granted the right to pass resolutions.[17] Finally, it should be noted that the relief requested by plaintiffs would appear to run afoul of the admonition in *Carothers* that courts refrain from using LMRDA to "impose on labor unions whatever procedures or practices they regard as 'democratic.'" 818 F.2d at 934. Accordingly, summary judgment will be entered in favor of defendants on this claim.[18]

### III. Duty of Fair Representation

In their complaint as well as their motion papers, plaintiffs have alleged that the Union breached the duty of fair representation that it owes to its members.[19] Nowhere in their pleadings do defendants address the fair representation claim and, accordingly, it must be assumed that defendants have conceded this point. In any event, the defendant's refusal to provide plaintiffs with the changes to the carhaul contract, while simultaneously offering them to the Union's representatives and to members interested in other contracts, violates the Supreme Court's command that the bargaining agent is required "to serve the interests of all members without hostility or discrimination toward any." *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967).

### IV. Relief

Section 102 of LMRDA provides that "[a]ny person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate." 29 U.S.C. § 412. Plaintiffs have prevailed on their claim that defendants' withholding of the text of the proposed carhaul contract violated their rights under LMRDA and amounted to a breach of the duty of fair representation. For this violation, they seek a declaration that their rights have been violated and an order compelling the defendants to provide copies of all future carhaul contracts and supplements to them once those documents have been provided to local Union representatives. Finding no reason why this relief would be inappropriate,[20] it shall be granted in favor of plaintiffs.

---

17. The cases cited by plaintiffs are inapposite. *Nelson v. International Association of Bridge, Structural and Ornamental Iron Workers*, 680 F.Supp. 16 (D.D.C.1988), involved a constitutional provision that "imposes a code of silence regarding *any* matter as to which union members might communicate." 680 F.Supp. at 25 (emphasis added). And *Navarro v. Gannon*, 385 F.2d 512, 518 (2d Cir.1967), *cert. denied*, 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294 (1968), was a case where "the Local meeting [was] taken over by the International."

18. One final point bears mention. Defendants have argued that the affidavits supporting plaintiffs' motion for summary judgment "should be stricken and disregarded" for various reasons. Defendants' Motion at 1–2 n. 1. Plaintiffs have, however, adequately rebutted these charges, which do not appear to have merit. Reply Brief at 1–3 & Reply to Response to Statement of Material Facts.

19. This duty arises under federal common law and the National Labor Relations Act, 29 U.S.C.

§§ 151 *et seq*. *See Warehouse Union v. NLRB*, 652 F.2d 1022, 1024 (D.C.Cir.1981).

20. Although defendants have not raised the point, it could be argued that requiring defendants to provide plaintiffs with *all* future contracts is overbroad, since Judge Edwards stated in *Carothers* that the remedy imposed for a violation of LMRDA must be "tailored to the violation." 818 F.2d at 931. Such an argument would overlook the context of *Carothers*, in which the district court entered an injunction granting a broad right of access to union mailing lists *without* a particularized finding that rights secured by LMRDA had been violated. Where, as here, such a finding is made, Judge Edwards noted that the remedy "may include an order that the union provide the injured parties with 'access' to its mailing list." *Id.* Given the undisputed evidence that plaintiffs have previously been granted access to the carhaul information and that other Union members have been granted access to similar information, the requested relief is clearly warranted.

**698**

V. Conclusion

For these reasons, it is

ORDERED that plaintiffs' motion for summary judgment be and it hereby is granted in part and denied in part; it is

FURTHER ORDERED that defendants' motion for summary judgment be and it hereby is granted in part and denied in part; it is

DECLARED that defendant William J. McCarthy and defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America have violated 29 U.S.C. §§ 411(a)(1) & 411(a)(2), and defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America violated its duty of fair representation, by refusing to provide plaintiffs with the text of the full carhaul contract on which they were to vote, including all the supplements, once the contract had been given to the representatives of the affected locals; it is

FURTHER ORDERED that defendants William J. McCarthy and defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America shall provide to plaintiffs copies of the complete text of all future carhaul contracts, including all supplements on which members will be asked to vote, once the national master language and appropriate supplements have been given to the representatives of the affected local unions; and it is

FURTHER ORDERED that this action be and it hereby is dismissed.