Creed PATRICK, John Braxton, Jerry Gaimari, J. Anthony Smith, and Lou Woodward, Plaintiffs,

v.

William J. McCARTHY and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO, Defendants.

Civ. A. 90–1524 SSH.

United States District Court, District of Columbia.

July 12, 1990.

Paul Alan Levy, Alan Butler Morrison, Public Citizen Litigation Group, Christine Allamanno, Teamsters for a Democratic Union, Washington, D.C., for plaintiffs.

Gary S. Witlen, Patricia A. Callahan, James F. Wallington, Intern. Broth. of Teamsters, Washington, D.C., for defendants.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on plaintiffs' motion for a preliminary injunction, on which the Court held a hearing on July 9, 1990. Upon consideration of the motion, defendants' opposition thereto, and the entire record herein, plaintiffs' motion is granted.

## Background

Plaintiffs, employees of the United Parcel Service ("UPS"), are members of the defendant International Brotherhood of Teamsters ("IBT") and of the Teamsters for a Democratic Union ("TDU"), "a national organization of rank-and-file members who seek to reform and democratize their union and to make it a more effective collective bargaining representative."[1] Complaint at 5. Defendant IBT is a labor organization within the meaning of 29 U.S.C. § 402(i), and defendant McCarthy is the General President of the IBT.

Members of the IBT who work for UPS are covered by a collective bargaining agreement with UPS called the National Master United Parcel Service Agreement ("UPS contract"). The IBT represents 200 locals and 140,000 employees of UPS in the bargaining process. The UPS contract is negotiated every three years, with the current contract to expire July 31, 1990. Under Article XII, Section 2 of the IBT constitution, a collective bargaining agreement must be ratified by the affected members. At issue in this case is the defendants' refusal to provide plaintiffs with the entire collective bargaining agreement that is about to be submitted to the members for a vote. If ratified, that UPS contract would remain in effect through July 31, 1993.

The UPS contract consists of a national agreement containing the basic terms and conditions of employment, and approximately thirty supplements applicable to separate geographic areas and/or job classifications. In accordance with standard IBT ratification procedures, and following national negotiations on the contract, the IBT summoned representatives of the local unions to a meeting in Chicago, Illinois, on June 26, 1990. At that meeting, the IBT presented the representatives with the complete UPS proposed contract, including all supplements.[2] The IBT leadership recommended that the offer be rejected, and, in fact, the representatives voted unanimously to recommend to the membership that they reject it. The representatives were then instructed to return to their local unions and hold meetings over the weekend of June 30–July 1 to present and discuss the proposed national agreement and applicable supplements. The ballots were to be mailed out on July 9, along with copies of the national agreement and applicable supplements, and a recommendation for rejection unless UPS improved its offer. The tentative deadline for returning ballots is July 30.

The UPS offer, including the national agreement and all of the supplements, is ratified or rejected as a single package by the vote of every member covered by the contract. Thus, although each member votes only on his or her own supplement together with the national agreement, the supplements are not independently ratified. *See Davey v. Fitzsimmons*, 413 F.Supp. 670 (D.D.C.1976).

After the June 26 meeting, members of the TDU's UPS Committee attempted to secure complete copies of the proposed agreement and all of the supplements, so that they could review them in preparation for the weekend local union meetings.[3]

1. In addition, members of TDU who work for UPS have formed a UPS Committee "through which [they] educate [them]selves and [their] fellow union members, and further the goals of UPSers and TDU within the company." (Patrick Affidavit at 2.) The UPS Committee distributes newsletters and leaflets concerning proposed contracts, and expresses its opinions at local union meetings called to discuss proposed contracts.

 Plaintiff Patrick is a member of Local 639 of the IBT and is employed at UPS in Burtonsville, Maryland. Plaintiff Braxton is a member of Local 623 of the IBT and is employed at UPS in Philadelphia, Pennsylvania. Plaintiff Gaimari is a member of Local 404 of the IBT and is employed at UPS in Massachusetts. Plaintiff

Smith is a member of Local 639 of the IBT and is employed at UPS in Chantilly, Virginia. Plaintiff Woodward is a member of Local 79 of the IBT and is employed at UPS in Tampa, Florida.

2. The standard procedure for ratification of national agreements was described by the court in *Bauman v. Presser,* 117 L.R.R.M. (BNA) 2393, 2394, 1984 WL 3255 (D.D.C.1984), *appeal dismissed,* 119 L.R.R.M. (BNA) 2247 (D.C.Cir.1985). *See also* Barlow Affidavit; Opalesky Affidavit.

3. Plaintiffs' attempts to assure themselves a complete copy of the proposed agreement actually began in mid-June. At that time, plaintiffs, four of whom had been plaintiffs in prior, sim-

Defendants' counsel advised plaintiffs' counsel that details of the proposed contract had been provided to the local representatives. However, she further advised that defendants, allegedly not under any obligation to provide plaintiffs with a copy since the representatives had agreed to recommend rejection of the proposal, would not provide plaintiffs with a copy. Subsequently, plaintiffs were able to obtain copies of the national agreement and three supplements. Based on that information, the TDU's UPS Committee decided, like the IBT, to recommend rejection of the contract.

On June 28, plaintiffs filed a motion for a preliminary injunction, requesting that defendants be ordered to produce the proposed UPS contract. Plaintiffs also requested an expedited hearing, and, on June 29, the Honorable Gerhard A. Gesell, sitting as motions judge, denied plaintiffs' motion for expedited consideration.[4] This Court held a hearing on plaintiffs' motion for a preliminary injunction on July 9.

However, on July 5, the IBT advised all of the local unions that UPS had made a second final offer, which would be mailed to the membership for their ratification or rejection on either July 11 or 12. Again, the IBT will not recommend to the membership that they ratify the new offer. If the members reject UPS's final offer, the Union's National Negotiating Committee has the authority to call a strike at the expiration of the contract, or, in its discretion, to return to the bargaining table. At least one informational meeting has been scheduled to discuss the new proposal. That meeting is being held on July 12 in San Francisco for local representatives in the western United States to explain the details of this latest proposal. In light of these developments, plaintiffs are now also seeking a full copy of UPS's latest proposal.

This case presents the Court with the latest chapter in a saga of litigation between members of the TDU and the IBT. In 1987, following the IBT's announcement that the 1987–1990 UPS contract had been ratified, plaintiffs Braxton, Gaimari, Smith, and Woodward filed suit seeking to overturn ratification of the agreement. As in this case, they argued that by having been denied the opportunity to review the proposed national agreement and all of the supplements, the membership had been denied an informed vote on the contract. The case was settled when the IBT agreed that, with respect to future UPS contracts, it would provide plaintiffs and their representatives with such information. *Braxton v. Presser*, No. 87–2742 [NHJ] (D.D.C.).

Similarly, in 1988, a TDU member employed by Signal Delivery Service requested that the IBT provide him with a full copy of a proposed Signal agreement negotiated by the IBT, including all supplements. When the IBT refused to provide a copy of the entire contract, the member filed suit, requesting a temporary restraining order that would require the IBT to provide him with the full contract prior to its mailing the ballots to the members. Based on the IBT's representations that it would provide the member with the contract, the court denied the motion for a TRO. However, the court set a further hearing date and stated that if plaintiff had not received a copy of the contract by then,

---

ilar litigation, wrote to defendants, reminding them of their legal obligations (as plaintiffs interpreted them) to provide the full contract, including all supplements, to any member requesting copies, as soon as the proposed contract had been presented to local union officials. Plaintiffs' counsel also sent a letter requesting compliance with the law. Defendants did not respond to the letters. In addition, plaintiffs' counsel made at least two phone calls to defendants during June, none of which was returned.

On June 21, plaintiffs' counsel wrote to defendants' counsel, warning that defendants' refusal to respond to letters and phone calls would leave plaintiffs with no choice but to seek judicial enforcement. Counsel for defendants responded the next day by assuring plaintiffs' counsel that once a proposal was presented to and accepted by the local union representatives, plaintiffs would receive a copy.

**4.** Judge Gesell held that under Local Rule 205 defendants were entitled to a fair opportunity to be heard, *i.e.,* five days within which to oppose plaintiffs' motion. Plaintiffs, however, were unwilling to request a temporary restraining order, because they did not want to disrupt the process by forcing the local unions to cancel their meetings.

the Court would seriously consider granting the TRO. The IBT provided the contract following the hearing. *See Riley v. McCarthy,* 723 F.Supp. 1521, 1522 (D.D.C. 1989).

The issue was raised yet again in 1988 when the IBT negotiated a proposed contract for employees covered by a collective bargaining agreement known as the National Automobile Transporters Agreement ("carhaul contract"). Two members of the TDU employed in the carhaul industry brought suit against the IBT when the IBT refused to provide them with the text of the proposed carhaul contract at the time it was provided to the local union representatives. The members argued in part that the IBT's refusal constituted a denial of their rights to an equal vote and to express their views. The court granted plaintiffs' application for a temporary restraining order, enjoining defendants from mailing ballots to the membership for five days. Ultimately, the court ordered that the IBT must provide those plaintiffs with all future carhaul contracts, including all supplements, once the contract has been given to the local union representatives. *See Carothers v. McCarthy,* 705 F.Supp. 687 (D.D.C.1989).

Rather than following the precedents as outlined above, or even making a good faith effort to abide by the spirit of the court's rulings, defendants have again refused to provide plaintiffs with a complete copy of the proposed UPS contract. Instead, they have forced the issue once again into litigation, by taking a narrow view of court precedent, apparently to further their own internal political purposes.

*Discussion*

In ruling on a motion for a preliminary injunction, the Court must consider four factors: (1) whether plaintiffs have made a strong showing that they are likely to prevail on the merits, (2) whether plaintiffs have shown that, absent such relief, irreparable injury will result, (3) whether issuance of the injunction will harm the in-terests of the other parties, and (4) whether the public interest supports the granting of relief. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841, 842 (D.C.Cir.1977); *Virginia Petroleum Jobbers Association v. FTC,* 259 F.2d 921, 925 (D.C.Cir.1958).

Turning to the merits of the dispute, the Court finds that plaintiffs have demonstrated that they are likely to succeed in this action.[5] Plaintiffs claim that by refusing to disclose the full terms of the UPS contract to plaintiffs, members who are to vote on the contract, the IBT has violated §§ 101(a)(1) and 101(a)(2) of the Labor–Management and Reporting Act of 1959 ("LMRDA"), 29 U.S.C. §§ 411(a)(1) and 411(a)(2). These subsections provide:

(a)(1) Equal rights. Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) Freedom of Speech and Assembly. Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

---

5. In fact, through the Court's granting of plaintiffs' motion, plaintiffs effectively have succeeded on the merits, since they have been granted the relief sought in their complaint.

Congress passed these provisions in order "to protect free speech and assembly rights because these are considered 'vital to the independence of the membership and the effective and fair operation of the union as the representative.'" *Reed v. United Transportation Union*, 488 U.S. 319, 109 S.Ct. 621, 625–26, 102 L.Ed.2d 665 (1989) (quoting *Hall v. Cole*, 412 U.S. 1, 8, 93 S.Ct. 1943, 1947, 36 L.Ed.2d 702 (1973)). In doing so, Congress

> enumerated specific rights designed to ensure that unions adhere to certain basic democratic principles. Those principles must be gleaned from the statute itself; they may not be derived from a court's perception of what union procedures are necessary to guarantee a 'fully informed vote.'"

*Carothers v. Presser*, 818 F.2d 926, 934 (D.C.Cir.1987). Thus, in order for plaintiffs to prevail, the Court must find that the IBT violated one of the specifically enumerated rights granted by Congress. *Id.* at 931; *see also Mallick v. Int'l Brotherhood of Elec. Workers*, 749 F.2d 771, 786 (D.C.Cir. 1984).

■ Plaintiffs first contend that they were denied their right to an equal vote. Courts have interpreted this right to mean more than simply universal suffrage. Rather, each member has the right to a "meaningful vote." *Bunz v. Moving Picture Machine Operators' Union*, 567 F.2d 1117, 1121 (D.C.Cir.1977) (citations omitted). "Accordingly, the courts have found that the 'equal right to vote' was denied, notwithstanding universal suffrage, where union officials circulated inadequate or misleading information about matters to be voted upon...." *Id.*

In this case, just as in *Carothers v. McCarthy*, it is clear that plaintiffs have been denied access to complete information about the contents of the proposed UPS contract, despite their repeated requests. All attempts by plaintiffs and their counsel to obtain this information have been thwarted, despite the fact that courts have in the past required defendants to provide the information. Defendants argue, however, that despite the IBT's refusal to produce the entire contract, plaintiffs have not been denied their right to a meaningful vote, because plaintiffs, like all members, are provided with both the national agreement and the individual supplements that specifically apply to them. They contend that plaintiffs do not need the supplements that apply to any jobsite other than their own in order to exercise their rights to cast a meaningful vote. In support, defendants supply the Court with affidavits by IBT members declaring that union members never care about supplements other than their own. Defendants further contend that because plaintiffs have already made up their minds with respect to the proposed contract, they do not need further information.

By stating that plaintiffs do not need certain information in order to cast a meaningful vote, defendants are simply taking a political position. They have no right to tell plaintiffs what information contained in the contract is important and what is not. Furthermore, these plaintiffs have asserted that the information contained in the various supplements is important, for several reasons. First, if indeed the UPS contract proposal is rejected (and it now seems likely that it will be), the debate about what in the contract led to its rejection will be crucial to the negotiations leading to the eventual ratification of an acceptable contract. Second, UPS has now extended a new offer to the IBT, and plaintiffs should have the opportunity to review it, along with the first proposed contract, in its entirety. Third, a comparison of other supplements may reveal information about contract concessions made on either side which may be useful to plaintiffs in deciding whether each of their own supplements is acceptable.

■ Finally, plaintiffs would simply like to base their decisions on how to vote and on what to recommend to their fellow members on complete and accurate information. A "'meaningful vote' requires that 'lines of communication among the membership be as unfettered as reason can make them....'" *Bunz*, 567 F.2d at 1121 n. 22 (quoting *Blanchard v. Johnson*, 388

F.Supp. 208, 216 (N.D.Ohio 1975), *aff'd in relevant part*, 532 F.2d 1074 (6th Cir. 1976)). "[T]he proposal is a new contract and the members should [be] afforded ample opportunity to discuss and debate *all* aspects of the contract." *Bauman*, 117 L.R.R.M. at 2399 (emphasis in original). Furthermore, it is defendants who have interpreted the IBT constitution to allow for ratification of a contract as a single package, rather than ratification of all individual supplements.[6] Thus, when members vote, they are in reality voting for or against all of the supplements.

Even if plaintiffs already have formulated an opinion as to how they will likely vote on the first UPS proposal, defendants cannot use that in support of their position. After all, had defendants not withheld the information from plaintiffs, plaintiffs would have had it available when formulating their views. Furthermore, plaintiffs have not yet received their ballots and cast their votes. Nor have they seen UPS's latest proposal. Neither this Court nor the IBT should be permitted to tell plaintiffs when their deliberations on their votes must end.

The IBT makes an equally unacceptable argument with regard to its obligations as spelled out in the settlement agreement reached in the *Braxton* case. In the June 7, 1988, Order and Stipulation of Dismissal in that case, the IBT agreed to

> provide copies of the proposed national master language, and of all proposed supplements and riders, of the United Parcel Service Agreement to any of the plaintiffs (or their designated representative), immediately following the meeting at which the proposed agreement is accepted by representatives of the local unions.

The IBT asserts that if the local union representatives had voted, or were now to vote, to recommend acceptance of the proposed UPS contract, defendants would provide a complete copy of the proposal to plaintiffs. Of course, defendants may be technically correct in contending that the language of the *Braxton* settlement does

not compel them to produce the contract when, as in this case, the local union representatives have voted for rejection. However, defendants did knowingly agree to the terms of that settlement, and have not now provided the Court with any substantial reason why defendants should not have to provide plaintiffs with the full contract proposal. Nor have defendants disputed that it is just as important to plaintiffs to receive all information when the union leadership is recommending rejection of a contract, which could lead to a strike, as it is when the leadership recommends ratification of the UPS contract. Defendants argue only that they are not legally obligated to provide the full contract in a rejection situation.

The Court disagrees. Plaintiffs indisputably have a right to a meaningful vote, and that includes a right to be informed about the complete contract proposal. Only if the Court were also to find that by exercising this right plaintiffs would impair the right of the IBT "to adopt and enforce reasonable rules" concerning members' responsibilities toward the union, would defendants prevail. 29 U.S.C. § 411(a)(2). However, defendants have not pointed to a single rule, or even a legitimate policy, that would justify infringing on plaintiffs' right to a fully informed vote. Furthermore, if there were "in fact a hard-and-fast rule, it seems odd that defendants would have selectively violated it by providing plaintiffs with" the full contract whenever the local union representatives vote to accept it, but not when they vote to reject it. *Carothers v. McCarthy*, 705 F.Supp. at 694–95.

Plaintiffs also argue that defendants' conduct has violated their right to express views, opinions, and arguments on union affairs, which is guaranteed by § 101(a)(2) of the LMRDA, 29 U.S.C. § 411(a)(2). Defendants' opposition seems to be based on their assertion that plaintiffs themselves do not need the information, but that, in fact, it is the TDU which seeks this information in order "to indoctrinate [IBT members] with the TDU party line." In support of their assertion, defendants point to the

---

**6.** This interpretation has, of course, been upheld. *Davey*, 413 F.Supp. at 670.

facts that plaintiff Braxton did not even attend his local union meeting to discuss the UPS contract, that plaintiff Patrick attended his local meeting but did not speak, and that plaintiff Smith attended and distributed literature prepared by the TDU.

■ In this context, the members' right to express their views is intertwined with their right to an equal vote, and thus the Court will not reiterate what it has already said above. Recognizing that § 101(a)(2) "does not guarantee access to all information that a member might want to speak about," *Mallick*, 749 F.2d at 786, the Court still finds that by denying plaintiffs access to the complete contract, defendants also have violated plaintiffs' rights to express their views. Plaintiffs have a right to communicate their views about the entire contract with all members from any jobsite they wish. After all, all members vote to ratify or reject a contract as a single package, including all supplements. Similarly, plaintiffs may choose not to express their views based on the information they have. The fact is that plaintiffs have requested the information, expressing a need for it. To allow defendants to deny this access would be to allow them to dictate on what the members should express an opinion, and that constitutes an express violation of the plaintiff members' statutory freedoms of speech and assembly.

Defendants make much of the fact that the TDU, which as an entity is not entitled to access to the full contract, is the real party in interest, and that plaintiffs are simply "nominal" in this lawsuit. While this may be true to a significant degree, the fact remains that plaintiffs are members of the IBT, and they have a right to obtain the complete contract on which they will debate and ultimately vote. Defendants' pleading, as well as their arguments before the Court, reflect their distaste for the TDU, and it is apparent that there is no love lost between the TDU and the IBT. However, the Court may not allow defendants to deny plaintiffs their rights based upon their political differences. This is

precisely what §§ 101(a)(1) and (a)(2) are designed to prevent.[7]

The Court also is satisfied that plaintiffs will be irreparably injured if the Court does not order defendants to produce the full contract with all of its supplements. Defendants argue that now that the local union meetings have been conducted, plaintiffs' emergency need, if ever they had one, has passed. They also argue that because plaintiffs admittedly have already formed an opinion on which way to vote, they will not be injured by defendants' refusal to supply the full contract. Furthermore, they contend that because both the IBT and the TDU have decided to recommend rejection of the contract, plaintiffs cannot be harmed.

■ The existence of a new UPS proposal certainly bolsters plaintiffs' position not only that they will be injured, but also that their request for injunctive relief has not been made too late. It is true that local meetings were held on June 30 and July 1, and that they were the primary fora for discussion among members. However, with a new contract proposal at hand, and with time running out on the current contract, members now have an even greater need to obtain as much information as possible and to consult with one another. Once the ballots are cast (and members generally cast them soon after they are received, Patrick Affidavit at 3), plaintiffs' only remedy if they were later to succeed on the merits would be to seek to overturn the election results. Surely relief is favored before the election, because however disruptive an injunction may be during the course of an election, the effect of invalidating an election is even more disruptive. *See Lucas v. Townsend*, 486 U.S. 1301, 1305, 108 S.Ct. 1763, 1765, 100 L.Ed.2d 589 (1988) (Kennedy, J., in chambers). Even defendants could not disagree with this. Also, the TDU has not yet taken a position with respect to the new UPS contract proposal. And, even if the TDU is again in agreement with the IBT that this proposal should be rejected, other members may not

7. Because the Court finds that defendants have violated plaintiffs' statutory rights, the Court does not reach the issue of whether defendants breached their duty of fair representation.

agree and may seek to ratify the contract. Thus, members are entitled to access to all of the contract if they so request.

It is particularly true in this case, in which defendants have not shown that they will be harmed at all by providing plaintiffs with copies of both of UPS's proposed contracts, that granting plaintiffs relief at this time will cause little or no disruption. It is simple relief, and it certainly cannot be argued that it will disrupt the election process. It also does not cause undue interference with the internal affairs of the union. The only harm to themselves defendants may have shown is the loss of another political battle with the TDU, and that does not constitute a bar to plaintiffs' relief.

Finally, the public interest supports the granting of plaintiffs' requested relief. The public has an interest in assuring that unions, which have taken on a fiduciary duty with respect to workers in the United States, and in which those workers have placed their trust, do not abuse their power. The public also depends upon services and products which are provided by companies whose workers are represented by unions. Thus, the public has a strong interest in the smooth operations of such companies, and, derivatively, in the integrity of the employment contract negotiations process. Finally, the public has an interest in seeing that its court system, already overloaded, does not become further burdened with cases involving issues which have essentially been resolved, only because of a continuing struggle between a union and its dissident members. An appropriate order granting the motion for a preliminary injunction accompanies this Opinion.

### PRELIMINARY INJUNCTION

Upon consideration of plaintiffs' motion for a preliminary injunction, and the evidence and arguments submitted by both parties, for the reasons set forth in the accompanying Opinion it hereby is

ORDERED, that defendants IBT and McCarthy shall deliver to representatives of the plaintiffs

(a) the proposed United Parcel Service Contract, Supplements, Riders and Addenda that were presented to the local union representatives on June 26, 1990, and which the representatives voted to recommend that the members reject, and

(b) the second proposed contract, based on the United Parcel Service offer of July 5, 1990.

It hereby further is

ORDERED, that plaintiffs shall not be required to post an injunction bond in the circumstances of this case.

SO ORDERED.