**Norman F. BLANCHARD et al.,
Plaintiffs,**

**v.**

**Rolla R. JOHNSON et al.,
Defendants.**

**No. C 74–546.**

United States District Court,
N. D. Ohio, W. D.

July 5, 1974.

Supplemental Opinion Jan. 20, 1975.

Gerald B. Lackey, Toledo, Ohio, for plaintiffs.

Sanford Gross, Cleveland, Ohio, for defendants.

## MEMORANDUM and ORDER

### WALINSKI, District Judge:

This cause was heard on a motion for a preliminary injunction at hearings in Toledo, Ohio, on June 14 and 18, 1974, and in Cleveland, Ohio, on July 1, 1974. Plaintiffs seek to enjoin a referendum which is currently being held among the members of the defendant Great Lakes and Rivers District, Local 47, Masters, Mates and Pilots Union (hereinafter Local 47) on the question whether Local 47 should or should not affiliate with the International Longshoreman's Association (hereinafter ILA). Since the procedural background of this case has a bearing on the outcome, the Court will sketch it briefly.

On June 18, 1974, plaintiffs filed a complaint along with an application for leave to sue and a motion for a preliminary injunction in the Western Division of this Court. The complaint was based on §§ 101, 102 and 501 of the Labor Management Reporting and Disclosure Act, 29 U.S.C., §§ 411, 412 and 501; and it sought that the balloting on a referendum be enjoined, that the ballots be impounded and destroyed, and that any future referendum on the question of affiliation, as well as any actual merger or affiliation, be enjoined unless a plan therefor had first been submitted to this Court which contained provisions for full disclosure of all relevant terms of any proposed affiliation, accompanied by sufficient time before balloting for members to offer their views thereon, and adequate protections for the secrecy and integrity of the ballot. Plaintiffs further prayed that they be awarded their costs as well as reasonable attorney fees.

This Court ordered that a hearing on the motion be held in Toledo on June 14th. At that hearing, defendants, who are the officers of Local 47, filed a motion to dismiss for improper venue, and the Court took the venue motion under advisement pending the introduction of evidence to decide that question. The hearing continued on June 18th in Toledo and both sides offered additional testimony and documentary evidence on both motions.

On the afternoon of June 18th, the Court recessed the hearing, having come to two conclusions. First, because of testimony by defendants Johnson and Duff that ballots were being opened and counted as they were received and without the presence of impartial observers, this Court concluded that both the constitution of Local 47 and 29 U.S.C., § 411, had been violated in that the secrecy and integrity of the ballot had been seriously impaired. Accordingly, the Court ordered all of the ballots impounded and turned over to the Court. The order did not, at that point, enjoin any future referendum, the Court feeling it sufficient to leave the officers free to conduct another vote in accordance with Local 47's constitution and " * * * with adequate information as to the terms of any affiliation with the ILA."

Secondly, the Court also concluded that venue was improper in the Western Division of this Court and ordered the cause transferred to the Eastern Division for all further proceedings. Since the venue provisions in the local rules do not specifically cover the facts of this case, the Court felt guided by the venue

provisions of 29 U.S.C., §§ 185(c) and 412, and by 28 U.S.C., § 1391(b).[1]

Defendants decided to hold another referendum immediately and on June 21, 1974, a new ballot and cover letter were mailed to all members of Local 47. Plaintiffs immediately filed a motion for a temporary restraining order which this Court declined to issue. Instead the Court ordered the matter set for another hearing on the motion for a preliminary injunction, and that hearing was held on July 1, 1974, in Cleveland, Ohio. More testimony was taken, and more documentary evidence was admitted. On the basis of all the evidence adduced thus far at all the hearings, the Court will now proceed to consider the issues.

## THE FACTS [2]

Local 47 is a labor organization within the meaning of 29 U.S.C., § 402. Its membership is made up of approximately 550 men who are employed as supervisory personnel on ships which sail the Great Lakes and adjoining rivers and waterways. These men are the captains and mates who command the vessels, and as such they earn from $20,000 to $40,000 per year. The principal office of Local 47 is in Cleveland, Ohio, but its members are found in every state of the union.

For many years, Local 47 was affiliated with the International Organization of Masters, Mates and Pilots (hereinafter IOMMP), but in November, 1973, it broke away from that organization because the IOMMP made certain changes in its constitution which threatened the autonomy of Local 47. By the word "autonomy" the parties herein refer to the right of a labor organization to hold and keep its own money and property, to elect its own officers, to negotiate its own contracts, and to manage its own affairs free from interference by any other organization.

Sometime before 1973 the IOMMP affiliated with the ILA into what is called the International Marine Division (hereinafter Marine Division) of the ILA. The constitution of the ILA provides that the Marine Division may govern itself, but it also provides that the Executive Council of the ILA may adopt amendments to the constitution "defining" the relationship of the Marine Division to the ILA consistent with the affiliation agreement between the IOMMP and the ILA.

The ILA constitution contains two other articles which are also relevant to this dispute. Article V, § 2, provides that the ILA has "supreme legislative, executive and judicial authority" over all members and subordinate bodies, and that the ILA shall ultimately determine all matters "affecting the welfare" of the membership.

Article XX provides that the President of the ILA may, without a hearing, suspend the officers of any local union or district organization and appoint a trustee therefor whenever he deems it necessary to carry out any of certain purposes enumerated in § 1 of Article XX. The first four purposes pertain to specific abuses of power, but the remaining two are rather general in their terms:

"(5) to restore democratic procedures, or (6) otherwise to carry out the objects and purposes of the ILA."

The appointed trustee is to take control of the books, records, property, assets, funds and affairs of the union. The matter then goes to the executive council of the ILA who can continue the trusteeship, order new elections, consolidate two or more local unions, or:

" * * * reorganize, dissolve, or amend the charter or jurisdiction of any Local Union, District Council or District organization."

---

1. Section 1391(b) was considered relevant because 29 U.S.C., § 501 contains no venue provision.

2. What follows in this part of the Opinion constitutes the Court's findings of fact from all the relevant evidence.

Ultimately, if a local union is ordered dissolved or expelled, its funds, property and assets revert to the ILA.[3]

While Local 47 was going through the process of disaffiliation with the IOMMP, it began to receive inquiries from other organizations as to possible affiliation with them. These included inquiries from the International Brotherhood of Teamsters, the Marine Engineers Beneficial Association—Associated Maritime Officers (hereinafter MEBA), the ILA, the Steelworkers Union, and Local 333, United Marine Association. A convention of Local 47 adopted a resolution in March, 1972, that:

" * * * any proposal for affiliation from any national or international Union shall be submitted to the membership for ratification or rejection by secret ballot."

The resolution further provided that a majority of those voting would control.

It is not clear from the evidence how many proposals for affiliation were received by Local 47. It is clear, however, that definite proposals were received from the ILA, MEBA, and the Teamsters; but only the proposal from the ILA was submitted to the membership for a vote.[4]

Sometime in the spring of 1974, MEBA began soliciting for membership therein among the officers and mates of the ships on the Great Lakes, especially the fleets operated by the various steel companies. By June 5, 1974, both MEBA and Local 47 claimed to represent a majority of United States Steel Corporation's licensed mates. In order to resolve this conflict, United States Steel entered into an election agreement with MEBA and Local 47 in which all its licensed mates would choose among MEBA, Local 47 or no union at all. Local 47 sought an injunction of this election in the Common Pleas Court of Cuyahoga County, Ohio, but that injunction was denied and that election was ongoing at the time of the hearings in the present case. The executive board of Local 47 knew about MEBA's organizational efforts, which they prefer to call a "raid", as early as April, 1974.

Sometime around May 16, 1974, defendant Johnson, acting on behalf of the executive board, completed negotiations with the President of the ILA for an affiliation of Local 47 with the ILA. At no time did he or defendant Duff read the constitution of the ILA, preferring instead to rely on the oral assurances of its President Gleason that Local 47 would retain its autonomy. Johnson was also assured that if the arrangement didn't work out, the parties could "shake hands and go their separate ways." This understanding was not reduced to writing or communicated to the membership. Neither was there any written understanding as to the relationship of Local 47 to the ILA in light of the before-mentioned articles of the constitution of the ILA. No officer or agent of Local 47 was offered any benefit from the ILA in consideration of affiliation, and the actions of all the parties appear to have been motivated solely by personal views as to what was best for the membership of Local 47.

On May 24, 1974, the defendants mailed a ballot to each member of Local 47 for a referendum on the question of affiliation with the ILA. No other proposal was offered for a vote. The letter attached to the ballot purported to represent the entire agreement between Local 47 and the ILA, but it contained no mention of the previously discussed oral agreements, of any per capita tax, or of any constitutional provision of the ILA. It was the position of defendant Johnson at the hearing on the motion that the

---

3. Here the Court takes notice of its own decision in Degan v. Licensed Tugmen's Ass'n, No. C 70–318 (decided October 4, 1973), in which the ILA imposed a trusteeship on a local in part because its president sought to disaffiliate with the ILA.

4. The MEBA proposal appears to have included autonomy for Local 47 while the Teamsters offered a million dollar fund for organizational purposes.

members of Local 47 had no right to vote on any proposed affiliation or merger "when it is to their detriment and we know it is to their detriment."

Subsequently, this suit was filed seeking the preliminary injunction.

## CONCLUSIONS OF LAW

Plaintiffs base their claims primarily on two separate statutes, both of which are part of the Landrum-Griffin Act, or the Labor Management Reporting and Disclosure Act (hereinafter LMRDA). The first, 29 U.S.C. § 411(a)(1) provides that:

"* * * every member of a labor organization shall have equal rights and privileges within such organization * * * to vote in * * * referendums of the labor organization * * *."

The second statute, 29 U.S.C., § 501(a), provides:

"The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and by-laws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy."

Basically, plaintiffs contend that the equal right to vote in referenda granted by § 411 is the right to an informed vote, or at least one not made uninformed because of actions by union officials. They further contend that § 501(a) created a duty on the part of union officials to inform the membership fully on any affiliation as mandated by Local 47's convention resolution and to let the membership of Local 47 determine for itself its future course in light of all affiliation proposals and the terms thereof.

The LMRDA is the embodiment of a clear intention on the part of Congress that the members of a labor organization have the right to a "full and active participation" in the affairs of the union. *See* American Federation of Musicians v. Wittstein, 379 U.S. 171, 85 S.Ct. 300, 13 L.Ed.2d 214 (1964). As Chief Judge Lumbard of the Second Circuit pointed out, Congress determined that:

" * * * the efficiency of a monolithic union under autocratic rule was gained at too great a price if it necessitated any sacrifice in the members' rights to determine the course of their organization. The balance was struck in favor of union democracy. Only a *union responsive to the rights of all its members can achieve the ideals of responsibility, opportunity and self-determination that are recognized as fundamental values* in the labor movement. Navarro v. Gannon, 385 F.2d 512, 518 (2nd Cir. 1967).

In light of this Congressional policy, *it is clear that any right to vote which is guaranteed by § 411 must be the right to a meaningful vote.* Indeed, the Sixth Circuit has held as much. *See* Sertic v. District Council of United Brotherhood of Carpenters, 423 F.2d

515, 521 (6th Cir. 1970). A meaningful vote is not a deliberately uninformed vote, because as such there is no choice, no selection, but merely a shot in the dark. In the view of this Court it would be chimerical to hold that Congress guaranteed an equal right to vote on union affairs without also guaranteeing that the processes of enlightenment be kept open.

■■ Since this policy underlies all of the LMRDA, the duties created in § 501(a) must include the duty to keep the membership informed on matters which they, the rank and file, must decide. That is not meant to say that union officials may not state their own views and take a stand on the issues. They must not, however, use their own right to discuss union matters as an excuse to withhold pertinent, relevant information. It is the duty of the union leadership under § 501, as fiduciaries, to see that the lines of communication and dissemination of views and opinions are kept open and working, especially as to matters on which members will be asked to vote.

It should also be noted that the constitution of Local 47 demands as much. In Article II thereof, one of the purposes of the organization is:

"* * * to engage in a program of education of our members whereby facts, information, knowledge, views, arguments, and opinions relating to all matters * * * are made available to enable them better to evaluate, judge, and formulate opinions with respect to such matters that influence their lives and the affairs of this organization." (Pl. Ex. 4.)

Here it is important to note that § 501(a)(1) requires that union officers carry out their duties in accordance with their constitutions.

■ Accordingly, in view of these statutory and constitutional provisions, this Court holds that the plaintiffs and all other members of the defendant Local 47 had a right to know and vote on all affiliation proposals, to know all the terms thereof, as well as the governing law of any organization with which they were to affiliate, and to know the views of other members on the proposals. In this holding, the Court is especially guided by, *inter alia,* two cases.

In Cefalo v. Moffett, 333 F.Supp. 1283 (D.D.C.1971), the court was faced with, as here, a challenge to a proposed union merger by several members based on § 501. The court concluded that that section gave it jurisdiction to hear the claim and that the importance of the issue of merger required prior notice that the issue would be considered and adequate and timely dissemination of all merger details. This holding is therefore particularly applicable to the present case.

In Sheldon v. O'Callaghan, 497 F.2d 1276 (2nd Cir. decided May 28, 1974), several union members of the IOMMP sought an injunction to prevent a new constitution from taking effect. They based their suit on § 411, contending that the union officers had violated that section as well as the old constitution in:

1) not permitting separate votes on the various provisions of the new constitution;

2) by publishing allegedly misleading information about the new one; and

3) in refusing to permit plaintiffs to state their views in the union newspaper or to have access to the union's mailing list in order to disseminate their views.

The court rejected the first contention and did not decide whether misleading information had been published. It did decide, however, that a fair referendum under § 411 included the right of the members to have an opportunity to present their views through access to the union's mailing list. Therefore this holding is also applicable to the present dispute.

■■ That defendants Johnson and Duff had only good intentions does not insulate them from the requirements of

the LMRDA. The clear policy of the act is to bid farewell to the regime of benevolent well-meaning union autocrats and to give favor to a system of union democracy with its concomitants of free choice and self-determination.

 Moreover, in drafting the LMRDA, Congress did not write on a clean slate. The cornerstone of federal labor law as respects the rights of employees is § 7 of the National Labor Relations Act, 29 U.S.C., § 157; and it antedates the LMRDA by several years. Section 7 gives employees the right to associate or not associate with a labor organization. N. L. R. B. v. Granite State Joint Board, 409 U.S. 213, 93 S.Ct. 385, 34 L.Ed.2d 422 (1972). In enforcing the right to associate or not it has been held that employees have the right to exchange views among one another in order to facilitate free choice. *See, e. g.,* N. L. R. B. v. Nat'l Org. Masters, Mates & Pilots, 253 F.2d 66 (7th Cir. 1958). Section 7 would be a hollow right indeed if the only free and meaningful choice that an employee had were on the question of organizing a union, and there was no correlative free and meaningful choice on the question of affiliation of that union with another.

Accordingly, the Court must grant the preliminary injunction as prayed for. Therefore, it is

ordered that defendants be enjoined from continuing and completing the current referendum on affiliation with the International Longshoreman's Association. It is

further ordered that no future referendum on affiliation with any organization be conducted by defendants or anyone on their behalf until a plan for the conduct thereof has first been submitted to, and approved by this Court. No such plan will be approved unless it contains, at a minimum, adequate safeguards for the secrecy of the ballot, full disclosure of all the terms of all affiliation proposals, as well as copies, or the provisions of the constitution of the organization with which affiliation is to be considered and voted upon, and access to the mailing list of defendant Local 47 by all members in sufficient time to express their views before a vote is to begin.

### SUPPLEMENTAL OPINION

This cause is before the Court on a motion by District 2, Marine Engineers Beneficial Association, Associated Maritime Officers [hereafter MEBA] to intervene as a party plaintiff and on a motion by MEBA to be placed on the ballot on a referendum to be held on the question of affiliation. The defendants have also petitioned the Court for its approval of their plan for the conduct of the balloting. All have briefed these matters.

 As the Court has taken pains to show in its Memorandum of July 9, 1974, this suit is based on statutes, 29 U.S.C., §§ 412 and 501, which confer certain rights on *members* of labor organizations. Thus, there are no rights here being asserted which benefit unions as distinct from their members. Therefore, since Rule 24, Federal Rules of Civil Procedure, assumes that there is an intersection of interests among plaintiffs and intervenors, it is clear that the motion to intervene of MEBA must be denied.

Placing MEBA on the affiliation referendum ballot is quite another matter however. Although it is true that § 3 of Article XXIII of the Constitution of Local 47 does not require that all affiliation proposals be voted upon on the same ballot, it somehow seems unnecessarily grudging for the union officers to conduct a referendum on only the proposal which they personally support. This Court has previously indicated that it would not hesitate to enjoin the defendants from using the union constitution to avoid a referendum on an affiliation proposal. Such a refusal by union officers, who are, after all, fiduciaries, runs afoul of the policies which underlie §§ 411 and 501, because seriatim balloting in this case may result in unfair advantage for the proposal favored by the un-

**216**

ion leadership. Thus, the Court will enjoin the use of the constitutional provision and order the MEBA proposal placed on the ballot along with the ILA proposal.

As to the defendants' plan for holding the balloting, the Court expressly approves the use of the American Arbitration Association.

 Plaintiffs' objections to the timing of the referendum do not appear to be well taken. Given the wide geographic dispersal of the membership, no time would seem to be particularly felicitous for any election. However, the wide dispersal does argue for a maximum period of time between the mailing of ballots and the deadline for their return so as to facilitate the free discussion and interchange of ideas which lie at the heart of § 411. The Court therefore finds any period of less than thirty (30) days for balloting to be suspect, within the facts of this case. The Court will thus require at least thirty (30) days for the members to discuss the issues and return their ballot.

Plaintiffs' objections to the limitations on the mailing of views by members are well taken. The Court agrees that there is no reason why members should be denied the opportunity to mail their views as often as they wish and at the times they wish. Since the concept of majority rule is at the center of federal labor policy, Sheldon v. O'Callaghan, 497 F.2d 1276, 1282 (2nd Cir. 1974), it is imperative that the lines of communication among the membership be as unfettered as reason can make them. Union officials bear a heavy burden of justification for any acts which unnecessarily restrain the ability of the members to discuss matters on which they are to vote. No justification for this limitation has been offered by the union leadership and none appears to the Court. Accordingly, the plan as proposed is modified to permit any member to mail his views at any time to the membership as often as he chooses so long as he bears the expense of the mailings.

To sum up: The motion of MEBA to intervene as a party plaintiff is denied; the affiliation proposal of MEBA shall appear on the ballot along with that of the ILA; the referendum shall be held at such time as defendants propose through the auspices of the American Arbitration Association; defendants shall permit at least thirty (30) days for dissemination of views by the membership following the mailing of the ballots; and any member shall be permitted to mail his views at any time to the membership through the AAA, as often as he wishes so long as he bears the expense thereof. It is so ordered.