**Jesse FULK and Donald Cearlock, Plaintiffs–Appellees,**

v.

**UNITED TRANSPORTATION UNION, Defendant–Appellant.**

No. 95–1953.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1995.

Decided April 18, 1996.

James P. Baker (argued), Springfield, IL, for Plaintiffs-Appellees.

William K. Cavanagh, Cavanagh & O'Hara, Springfield, IL, Kevin C. Brodar (argued), United Transp. Union, Cleveland, OH, for Defendant-Appellant.

Before CUMMINGS, CUDAHY, and FLAUM, Circuit Judges.

CUDAHY, Circuit Judge.

The United Transportation Union (UTU) appeals the district courts denial of its motion for summary judgment in a suit brought by two of its member railroad workers, Jesse Fulk and Donald Cearlock. The plaintiffs challenged the voting method employed by the Union to dispose of certain "productivity funds." The claim was brought under the equal rights provision of the Labor–Management Reporting and Disclosure Act (LMRDA). 29 U.S.C. § 411(a)(1). The plaintiffs allege that the voting procedure which was used to decide the fate of these funds discriminated against them because of its purported bias in favor of those holding a minority viewpoint.

Following the district court's denial of its motion for summary judgment, UTU filed a motion for certification pursuant to 28 U.S.C. § 1292(b) which was granted by the district court. UTU then filed a petition for permission to appeal, which we granted on April 7, 1995. Having heard the appeal, we now reverse the district court's denial of summary judgment.

I. *Factual Background*

UTU represents certain workers employed by the Norfolk Southern Railroad (the Railway). These workers are grouped by the Railway into several geographic districts, known as "seniority districts." Plaintiffs were members of the Springfield District. The Union membership was also divided into several, considerably larger, geographical units, known as general committees of adjustment (GCAs), which in turn were comprised of local subcommittees. Plaintiffs were also members of the same general committee of adjustment, which embraces several seniority districts.

This dispute arose when UTU brought up for membership vote a proposed modification of its agreements with the Railway. The "crew consist" agreement, covering conductors, brakemen and yardmen, governs the

size of the crew used to operate each train. The original agreement, adopted in 1984, allowed the Railway to reduce the crew size from two brakemen and a conductor to one brakeman and one conductor as workers retired or otherwise left the Railway's employ. As a complement to the reduction in crew size, the Railway agreed at that time to share the resulting cost savings with the workers. Whenever a train ran with only two crew members, the Railway paid $53.25 into a "productivity fund," which was credited to the workers. A separate productivity fund was maintained for each seniority district. The amount paid into each fund depended on the number of trains in that particular district which had been operated with two-member crews.

The modifications disputed here were negotiated in 1991. There were two modifications proposed: First, the crew consist agreement was to be modified to allow the Railway to operate with one-person crews when the size of the work force within a particular seniority district had declined sufficiently. Second, the productivity funds were to be eliminated. In their place, the Railway would make a one-time payment in December 1991 of $20,000 to each employee and an additional payment of $40,000 to each employee upon death, retirement or termination of employment.

The two parts of the proposal were presented separately to the membership for approval. If the membership failed to approve the modification to the crew consist agreement, the whole plan was to be abandoned. However, if the crew reduction were approved, it would go into effect whether or not there was a vote approving the productivity fund buyout.

The union leadership decided to implement a different voting procedure for each of the two proposals. The reduction in crew size was put to an aggregate vote of all members of a particular GCA. Votes were tallied within each craft (conductor, brakeman and yardman). Acceptance of the proposal by a majority of each craft's workers was required to pass the new crew consist agreement. In the event, the crew consist agreement was approved by the membership.

The union leadership took a different approach to the productivity fund buyout. The buyout was put to an independent vote in each seniority district, with the result in each district determining the fate of *that district's* productivity fund. The district by district voting procedure was justified by the fact that the value of the funds varied from district to district, as did the relative proportion of older workers to younger workers. Within each district, a majority of each craft was again required to approve the proposal. The results of the productivity fund buyout vote were mixed, with some districts approving and others rejecting the proposal. Six hundred votes in all were cast within the GCA. Among those voters, the buyout received approval by nearly two-thirds of those voting in each craft. In the Springfield district, however, the proposal failed to carry the vote among brakemen and therefore was defeated.

Plaintiffs Fulk and Cearlock complain that the district by district voting procedure violated Article 85 of the Union Constitution which reads:

> The General Chairperson must poll the entire membership holding seniority and working in the craft involved on the property by mail referendum ballot prior to signing any system agreements and be governed by the majority of the votes cast.

Union Constitution, UTU App. at 41.

The Union disputes the plaintiffs' interpretation of the Constitution, the issue being whether the productivity fund buyout was a "system agreement." For purposes of summary judgment, we assume that the Union Constitution was violated by the procedure. The issue before us, then, is whether the district by district voting procedure, even assuming it broke Union rules, infringed upon the equal rights guaranteed by the LMRDA.

## II. *Analysis*

The equal rights section of the LMRDA states:

> Every member of a labor organization shall have equal rights and privileges within such organization to nominate candi-

dates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

29 U.S.C. § 411(a)(1).

Analysis of the compliance of union practice with this section proceeds in two steps: First, the court must determine whether every member was given "equal rights and privileges." If not, the court must decide if the inequality is a result of "reasonable rules and regulations." Because we assume here that the productivity fund voting procedure violated the Union Constitution, we need only address the first question: Were the plaintiffs denied equal rights and privileges by the procedure used?

The interpretation of § 411(a)(1) has generated a certain amount of controversy among the courts of appeal. In *Calhoon v. Harvey*, 379 U.S. 134, 138–39, 85 S.Ct. 292, 295–96, 13 L.Ed.2d 190 (1964), the Supreme Court rejected an attempt to stretch the language of § 411(a)(1) to encompass attacks on the general reasonableness and validity of union rules and regulations. There, the Court set out the general principle that infraction of § 411(a)(1) requires discrimination. The Court noted that the LMRDA equal rights provision "is no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote." *Id.*

In the wake of that decision, the circuits have struggled to determine the extent to which the right to nondiscrimination encompasses a right to a meaningful vote. The Ninth Circuit, in *Ackley v. Western Conference of Teamsters*, 958 F.2d 1463 (9th Cir. 1992), has taken a hard line, ruling that, even if a union provides incomplete or biased information upon which members rely in making their voting decisions, there is no violation of § 411(a)(1), so long as all members are given the same information. That court opined that the equal rights provision "is an anti-discrimination provision, pure and simple" which "prohibits discrimination against people, not against ideas." *Id.* at 1473–74.

The Fifth Circuit, on the other hand, allowed a claim to be brought under § 411(a)(1) which alleged that *all* members had been deprived of their right to vote on substantial changes in the collective bargaining agreement. *Christopher v. Safeway Stores, Inc.*, 644 F.2d 467 (5th Cir.1981). That court "decline[d] the Union's invitation to read this statute to mean that a right created or protected by the statute may be abridged with abandon provided there is an even-handed denial to all." *Id.* at 470.

■ This court has strictly followed the requirement that an action under § 411(a)(1) allege *discrimination* against some union members. *Lux v. Blackman*, 546 F.2d 713, 716 (7th Cir.1976); *Grant v. Chicago Truck Drivers, Helpers & Warehouse Workers Union*, 806 F.2d 114, 117 (7th Cir.1986). We have rejected the approach of the *Christopher* court, finding no violation of § 411(a)(1) when a union failed entirely to submit a matter to a vote. *Talbot v. Robert Matthews Distributing Company*, 961 F.2d 654, 666 (7th Cir.1992). We have never confronted the question presented in *Ackley*, whether a union can violate § 411(a)(1) by biasing the information received by members before the vote is taken, nor need we decide it today. We have, however, been willing to scrutinize facially neutral voting practices to determine whether, in practice, they prove discriminatory.

For example, in *McGinnis v. Local Union 710, International Brotherhood of Teamsters*, 774 F.2d 196 (7th Cir.1985), *cert. denied*, 475 U.S. 1121, 106 S.Ct. 1638, 90 L.Ed.2d 184 (1986), we found that a union rule requiring that all votes be cast in Chicago violated the LMRDA equal rights provision. Because many members of the union in question did not reside in Chicago, we recognized that this rule, though facially neutral, had a discriminatory impact which resulted in denying equal voting rights to those living outside of the Chicago area.

■ Plaintiffs rely on our statement in *McGinnis* that "when a union provides its membership with the right to vote on a certain matter, the right must be extended on an equal basis and *in a meaningful man-*

*ner.*" *Id.* at 199 (emphasis added). They contend that splitting the productivity buyout vote into districts was a form of gerrymandering which diluted their votes and made them less meaningful.

It is true, as a statistical matter, that voting by districts is more favorable to minorities than at-large voting.[1] This is the case even if those favoring and opposing a particular measure are distributed randomly throughout the geographical area involved. The smaller the voting units, the more likely that, simply by chance, the vote tally in some of the units will favor the minority position.[2] Thus, plaintiffs are correct in saying that the voting method implemented for the productivity fund question favored the minority anti-buyout position.

We do not agree, however, that this choice of voting method is inherently discriminatory. The voting units here, drawn as they were along existing seniority district lines, were not designed to enhance the power of any previously existing group. Division into smaller voting units always enhances the impact of those who take the minority position, *whichever it turns out to be*, simply because the districts are no longer a package deal. Because one never knows, a priori, which individuals will be among the minority voters, the Plaintiffs' analogy to gerrymandering is inapposite. Gerrymandering is a process in which districts are drawn so as to favor (or disfavor) a group which can be identified before the election takes place. The group of "those who hold the losing position in the election" has no independent identity beyond the particular election and no identifiable members until after the votes are counted. The objectionable aspect of gerrymandering—the attempt to define district boundaries so as to reduce the influence of a certain well-defined group of voters—is simply not present in this case.

Plaintiffs also analogize the Union's alleged imposition of an unauthorized voting procedure to the post-election change of voting rule involved in *Bunz v. Moving Picture Machine Operators' Protective Union Local 224*, 567 F.2d 1117 (D.C.Cir.1977). In that case the District of Columbia Circuit ruled that § 411(a)(1) had been violated.

In *Bunz*, the union constitution required a two-thirds majority for passage of a certain proposal. After the vote had been taken, the proposal, which received a simple majority of votes, did not garner the requisite two-thirds of the votes. Union leadership in that case proceeded to adopt the proposal anyway, flouting the constitutional requirement. The *Bunz* court, reasoning that "the equal right to vote may be denied upon the occurrence of serious discrimination, irregularities, or foul play at any stage of the electoral process," found that reducing the percentage of votes required to pass the proposal "plainly discriminated against the minority." *Id.* at 1121.

The district court in the present case was persuaded by the purported analogy and, noting that we have cited *Bunz* favorably on occasion, denied summary judgment to UTU pursuant to its prediction that the *Bunz* approach would be adopted by this circuit. Dist. Ct. Op. at 10–11. We need not determine, in addressing the present matter, whether we would have adopted the *Bunz* approach if confronted by its facts.

While the last-minute rules change in *Bunz* may have robbed of their meaningfulness the minority votes which had already been cast, a union's a priori choice among non-discriminatory voting rules does not have that effect. There are many forms of democratic decisionmaking. Some procedures give more power to minorities than do others. The original two-thirds voting rule described in *Bunz*, for example, gave more

1. Indeed, this is the reason that minority voting rights advocates have long opposed at-large election of political representatives.

2. In the limiting case of one-person voting units, this conclusion is obvious. Here the units were apparently comprised of about twenty voters, Pl. Br. at 11, and two-thirds of the overall voting membership favored the buyout proposal. In

such circumstances, the laws of probability alone suggest that the proposal could be expected to fail in about ten percent of the districts. Of course, if the size of the productivity funds differed among the seniority districts, such that the buyout proposal was more attractive in some than in others, the rate of failure of the proposal might be even greater.

voice to the minority than the simple majority rule eventually imposed by fiat. No one suggests, however, that the original rule violated the equal rights provision of the LMRDA. There is no single "most equal" voting rule. Many different procedures, besides the simple majority referendum, can satisfy the requirement that each union member have an equal voice.

What distinguishes *Bunz* from the present case and relieves us of the need to decide whether *Bunz* was correctly decided, is the timing of the leadership decision to institute a new voting procedure. In *Bunz*, when union members made decisions whether and how to vote and whether and how to campaign for their preferred positions, they relied ·on the stated two-thirds-majority rule. The *post hoc* change in the rule at least arguably discriminated against members who had *already taken* a minority stance by depriving their votes of the value which the two-thirds rule promised to confer upon them. Because the rule was changed after the vote was taken, minority voters were also deprived of the opportunity to assess intelligently beforehand how much to campaign for their desired outcome in order to prevail in the election. The procedural changes, made after the minority voters had identified themselves by casting their votes, perhaps could be viewed as discriminatory. *But see Ackley*, 958 F.2d at 1474 (no violation of § 411(a)(1) to bias the available information in favor of a particular outcome).

Even if we were to agree that the *post hoc* rule change in *Bunz* violated § 411(a)(1), however, we would not be convinced that the district by district procedure instituted by Union leadership in this case, well in advance of the voting date, posed the same difficulties. The voting rule employed by the Union here no more discriminates against the members of the majority than did the original *two-thirds* rule in *Bunz*. It is simply one even-handed voting rule among many, which happens to afford the minority a more satisfying outcome than would a rule which determined the fate of all productivity funds in one fell swoop. Comparing the "equality" of the two procedures is like asking whether a referendum is more "equal" than a decision made by a representative legislature. One approach or the other may be more desirable or even fairer for a variety of reasons, but the question which is "more equal" is meaningless.

The Union action complained of here did not even go so far as to discriminate directly against a particular *idea*, as did the disbursement of biased information, which the Ninth Circuit, in *Ackley*, ruled consistent with § 411(a)(1). District by district voting is inherently advantageous to those voters holding the minority view, regardless of what that view is or who those voters are. Nonetheless, there is nothing unequal about the practice.

■ Of course, it may be that the Union violated its own Constitution by utilizing the district by district procedure. We express no opinion on that question, but merely reiterate that a failure to follow a union's internal rules does not, in and of itself, constitute a violation of the equal rights provision of the LMRDA. *Talbot*, 961 F.2d at 666 (7th Cir. 1992).

In conclusion, we reverse the district court's denial of UTU's motion for summary judgment. The district by district voting procedure used to determine the fate of the productivity funds did not discriminate against any member of the Union or even against any particular point of view. While, in hindsight it is clear that this procedure was more advantageous to those who favored maintaining the funds rather than selling them, no disfavored group could have been identified prior to the vote. When this is the case, there is no unequal treatment.

REVERSED.