**Paul MORRIS, et al., Plaintiffs,**

v.

**INTERNATIONAL BROTHERHOOD OF LOCOMOTIVE ENGINEERS, et al., Defendants.**

**No. 1:01CV2153.**

United States District Court, N.D. Ohio, Eastern Division.

Sept. 21, 2001.

---

Arthur L. Fox, II, Lobel, Novins & Lamont, Washington, DC, Theodore E. Meckler, Cleveland Heights, OH, for Paul

Morris, John M. Karakian, Tony Smith, Plaintiffs.

George Cohen, Bredhoff & Kaiser, Washington, DC, Harold A. Ross, Ross & Kraushaar, Cleveland, OH, Clinton J. Miller, III, United Transportation Union, General Counsel, Lakewood, Joseph Guerrieri, Jr., Guerrieri, Edmond & Calway, Washington, DC, for International Brotherhood of Locomotive Engineers, United Transportation Union, Defendants.

### *MEMORANDUM AND ORDER*

ALDRICH, District Judge.

In this case, the plaintiffs, Paul Morris, John M. Karakian, and Tony Smith, urge this Court to declare the voting on an ongoing union merger referendum null and void, to order that the ballots be impounded and destroyed, and to grant other, related declaratory and injunctive relief. The plaintiffs have moved for a temporary restraining order and a preliminary injunction. Both defendants, the International Brotherhood of Locomotive Engineers ("BLE") and the United Transportation Union ("UTU"), have opposed. The Court conducted a hearing on the plaintiffs' motion on September 17, 2001. For the following reasons, the Court grants the plaintiffs' motion for a preliminary injunction.

### I. Factual Background

The factual background of this case is relatively extensive. For the purposes of this order, a brief summary of the key facts will suffice. The BLE represents locomotive engineers, and has done so for well over a century. It currently has about 39,000 dues-paying members. The UTU represents conductors, trainmen, brakemen, and firemen; it was created in 1970 upon the merger of numerous smaller unions, but its predecessors have also been active for over a century. It currently has about 80,000 dues-paying members.

From approximately May, 1998 to May, 1999, the BLE and UTU engaged in merger negotiations. On November 19, 1998, the unions agreed to a 28–point, 4–page "Statement of Principles" to guide merger discussions. On or about May 9, 1999, however, the BLE broke off talks with the UTU because of certain financial concerns. Since that time, the National Mediation Board ("NMB"), which oversees implementation of the Railway Labor Act, has, in a number of cases, redefined certain railway crafts, creating a new craft of "train and engine service employees." This craft is an umbrella category that encompasses engineers, the craft represented by the BLE, as well as other crafts of which UTU members are a part. The result of these decisions is ultimately to cause smaller unions that previously represented specific crafts to be merged into the UTU, a larger organization.

In response to this turn of events, the BLE leadership again began considering a merger with the UTU, and, on June 19, 2001, Edward Dubroski, President of the BLE, sent a letter to its members announcing that merger negotiations had been reopened, and informing them, "there will come a time at which you will be asked to make a very important decision regarding the BLE's future." Aff. of Edward Dubroski, Exh. 19. On July 24, 2001, Dubroski sent a letter to the chairmen of certain intermediate BLE entities, informing them that an agreement had been drawn up, extolling its virtues, and inviting the chairmen to a special informational meeting in Cleveland on August 3–4, 2001. The date selected was a few days prior to the August 6, 2001 deadline set by the BLE and UTU leadership for mailing ballots to the membership. On August 1, 2001, one of the chairmen, John Karakian, a plaintiff here, wrote Dubroski, requesting that opponents of the merger be allowed to use

the union's mailing list to send out literature in opposition at their own expense, and further asking that the ballots not be mailed until August 15, 2001, in order to permit opponents to assemble their materials and disseminate them to members prior to their receiving their ballots. On August 3, 2001, Dubroski authorized the mailing, but denied the request to delay the sending of ballots. The ballots were sent on August 6, 2001 as scheduled, to be returned to the American Arbitration Association ("AAA"), the neutral body tallying the votes, by noon on September 14, 2001. This deadline was later extended to noon on September 17, 2001.

The ballots were accompanied by over 100 pages of material, namely, the Unification Agreement, the proposed constitution, and a letter from the BLE and UTU presidents urging the members to vote yes. As opponents of the merger attempted to raise the funds required to assemble a mailing, the BLE prepared its own informational mailing, including a videotape and other printed materials, which it mailed to members on August 10, 2001, as well as a power point presentation to be shown at local meetings. The plaintiffs, apparently unable to raise the necessary funds sufficiently quickly, never made a mailing, but did, in a letter dated August 17, 2001, request permission to post a statement in opposition to the merger on the BLE website. On August 21, 2001, Dubroski formally approved this access to the website, and the statement appears to have been posted to the website shortly afterwards.

On August 30, 2001, the plaintiffs filed a complaint in the United States District Court for the District of Maryland, and moved for a PI. The court dismissed the case on September 6, 2001 for lack of venue, and the plaintiffs subsequently filed suit in this Court on September 10, 2001, and moved for a TRO and a PI.

## II. Standard

A district court must consider four factors in deciding whether to issue a preliminary injunction: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. *Williamson County v. Slater*, 243 F.3d 270, 277 (6th Cir. 2001). These four factors are not to be mechanically imposed. *See Roth v. Bank of the Commonwealth*, 583 F.2d 527, 537–28 (6th Cir.1978). " 'The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met.' " *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir.2001) (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 400 (6th Cir.1997)).

## III. Analysis

The plaintiffs advance three main arguments in favor of their motion for a TRO and a PI: 1) that the BLE and the UTU have deprived the plaintiffs of their right to an informed and meaningful vote in the merger referendum by forcing a "quickie" vote to take place before literature in opposition to the merger was available to the membership, in violation of the Labor Management Reporting and Disclosure Act ("LMRDA"); 2) that the procedure for counting votes provided by the unification agreement, whereby the votes of Canadian BLE members' votes will be counted separately from American members' votes, violates both the BLE constitution and the LMRDA's provisions protecting equal voting rights; and 3) that the merger would result in a dues increase, and that the vote should therefore have been conducted by

secret ballot under the LMRDA. The plaintiffs also raise a number of other issues regarding irregularities in the referendum process, which are most appropriately considered in the context of the plaintiff's "meaningful vote" claim. The BLE and the UTU argue that the plaintiffs have not shown a likelihood of success on the merits of any of these claims. They further argue that the plaintiffs will not suffer irreparable harm if the TRO or the PI is denied, since the Court can enjoin the merger, if it is in fact approved by a majority of BLE members, after the vote is counted but before the merger's effective date of January 1, 2002. Finally, the BLE and the UTU argue that the balance of hardships favors them over the plaintiffs, since, if the TRO or the PI is granted, delegates at the upcoming BLE convention, scheduled for September 24, 2001, will most likely attempt to amend the BLE constitution to forbid any future merger with the UTU. These various arguments will be considered in turn.

## A. Meaningful Vote

■ The Court finds that the plaintiffs have shown a substantial likelihood of success on their claim that they were deprived of a meaningful vote in the merger referendum in violation of the LMRDA. Section 411(a)(1) of the LMRDA guarantees equal rights in voting to all members of labor unions:

> Equal Rights. Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

29 U.S.C. § 411(a)(1). This provision is part of the LMRDA Bill of Rights. It is intended to guarantee that unions are run democratically and to assure "full and active participation by the rank and file in the affairs of the union." *Sertic v. Cuyahoga, Lake, Geauga & Ashtabula Counties Carpenters Dist. Council*, 423 F.2d 515, 521 (6th Cir.1970) (internal quotation omitted). Nonetheless, the Sixth Circuit has recognized "the need to exercise what Judge Wisdom referred to as a 'sound reluctance … to interfere in internal union affairs.'" *Blanchard v. Johnson*, 532 F.2d 1074, 1078 (6th Cir.1976) (internal citation omitted). "A challenge to a union's political structure must be weighed from a practical viewpoint with due regard to the functions performed by unions as collective bargaining representatives, to the need for autonomy in selecting the most appropriate political structures, as well as to democratic theory and individual rights." *Amirault v. Shaughnessy*, 749 F.2d 140, 145 (2d Cir.1984).

■ The LMRDA guarantees union members not only an equal vote, but also a "meaningful" vote. *Bunz v. Moving Picture Mach. Operators' Union*, 567 F.2d 1117, 1121 (D.C.Cir.1977). Whether members were afforded a meaningful vote depends on "whether they were given adequate notice and information regarding the subject matter and nature of the vote" and whether they "had enough time and opportunity to mount effective support or opposition to the leadership's position." *Bauman v. Presser*, 117 L.R.R.M. (BNA) 2393, 1984 WL 3255, at *7 (D.C.Cir.1984).

Relying on a number of cases enjoining vote counts in union elections or referenda, the plaintiffs argue that the BLE has violated their right to a meaningful vote by conducting a "quickie" referendum, where the ballots were due just over a month after they were mailed out. *See Presser*,

1984 WL 3255, at *8 (holding that a "surprise" vote on a proposed collective bargaining agreement violated the LMRDA where "the vast majority" of members casting ballots did so without the benefit of an informational meeting, and where, "after the first key weekend, the holding of meetings and the circulation of literature was futile inasmuch as a large portion of the targeted audience had already voted"); *Blanchard v. Johnson*, 388 F.Supp. 208, 215–16 (N.D.Ohio 1974), *aff'd in relevant part*, 532 F.2d 1074 (6th Cir.1976) (finding that the plaintiffs were denied sufficient time and opportunity to express their views before a merger referendum began, and ordering that the union permit at least thirty days for dissemination of opposition viewpoints following the mailing of re-vote ballots); *Hayes v. Int'l Org. of Master, Mates & Pilots*, 670 F.Supp. 1330, 1334–35 (D.Md.1987) (declining to create "a *per se* rule which requires a union to mail opposition literature and ballots at the same time in all elections," but finding that the union had provided no justification for not sending the two together, even where it had provided a lengthy 90–day balloting period). The plaintiffs argue that the BLE acted improperly by refusing to delay the August 6 mailing of ballots until August 15, so that they could prepare and send their materials at the same time. They further argue that while they were unable to make their voices heard, the BLE leadership included material in support of the merger with the ballots, and followed up with other pro-merger literature soon after. The plaintiffs state that they wanted the membership to know of the dues increase that would affect some members, of a $100,000 pay raise that they calculated the president would receive (although the BLE denies that the president will receive any pay raise), and of other information regarding the "con"s of a merger with the UTU. They never did send this material to the membership, arguing now that it would have been futile for them to do so after many votes had already been returned and tallied and after the results of the ongoing tally had apparently, at certain times, been leaked.

The unions' primary argument is that the merger discussions had been going on for years, and relevant issues had been fully debated even before the ballots went out. They point to the fact that the unification agreement is based on the 28–point Statement of Principles circulated in 1998, a document that, by all accounts, engendered considerable debate within the membership. They further argue that they were contractually bound by the Unification Agreement to mail ballots to the members on August 6, returns due September 14. *See* Unification Agreement, Pl. Submission, Exh. 9. The unions also argue that they provided the members with all the information required by the LMRDA by providing the documents to be voted on, the governing law, and, beginning a few days after sending the ballots, power-point presentations and summaries on the BLE website. Finally, the unions argue that, while the unions were providing this information and various other facts regarding the merger to the membership, the plaintiffs never sent the mailing they sought to send with the ballots, and otherwise failed to make their voices heard, preferring instead to come to court for a preliminary injunction. In particular, the unions note that they had put plaintiffs on notice that the BLE's merger mailing (including the videotape and other pro-merger materials) would *not* be sent out until after the ballots were sent; indeed, they were not sent to the members until August 13, one week after the ballots were sent. On August 9, the BLE posted a notice on its website urging members to wait to vote until they had received the BLE's mailing. The un-

ions therefore argue that the plaintiffs, having heard many of the issues numerous times over the past two years, had sufficient time to read through the materials with the help of counsel, to prepare an opposition mailing, and to have that mailing in the members' hands at the same time the BLE mailing was sent, and before most members returned their ballots.

Based on the evidence and arguments presented to the Court to this point, the plaintiffs have shown a substantial likelihood of success on the merits of their claim that the BLE's refusal to delay sending the ballots altered the mix of information available to many BLE members at the time they voted, depriving them of information necessary to cast a meaningful vote. Although many issues regarding a merger, generally speaking, had been debated by the membership over the past two years, the members had no reason to know to what extent the unification agreement would incorporate the 1998 statement of principles. Furthermore, the statement of principles was only four pages long, while the unification agreement and the constitution that the members received with the ballots were over 100 pages long. Comparing the statement of principles with the unification agreement and the constitution, this Court cannot find that the four-page statement of principles provided a basis for a focused and complete debate on the merits of the merger, the mechanics of which were described in comprehensive detail only when the members received their ballots.

A focused debate was just not possible until this lengthy material was distributed. The plaintiffs, faced with this reality, asked for a nine day delay in sending the ballots, so that the members could receive the agreement, constitution, BLE materials, and opposition materials all at more or less the same time. The BLE rejected that request, and now argues that it was contractually obligated to mail the ballots by August 6. That the August 6 deadline was set in the unification agreement is of little consequence. By selecting such an early date, the BLE leadership put itself in the position of having to choose between fulfilling its contractual duty to the UTU and fulfilling its duty under the LMRDA to insure that its members had enough information to cast a meaningful vote. It selected the former option.

█ Finally, the unions' argument that any harm to the plaintiffs was caused by their own failure to follow through on mailing information to the members is unpersuasive. The plaintiffs did not have on hand the $15,000 required to make the mailing, and this was part of the basis for their request for a delay in mailing the ballots. The plaintiffs, seeing that many members had voted within the first week, eventually determined that it would be futile to follow through on the mailing. By August 17, the end of the first week of vote counting, 3696 of roughly 38,000 members had already voted. By the end of the second week, 7455 members had voted, and by September 4, 2001, just over a week later, 12,633 members had voted. *See* Declaration of Clinton J. Miller, III at ¶ 28. Because the ballots were being returned fairly rapidly, the plaintiffs have made a substantial showing that the BLE's refusal to delay sending the ballots caused a significant number of members to vote without the benefit of a focused opposition viewpoint. While the BLE may not have urged its members to vote as quickly as possible, the evidence presented thus far suggests that a significant number of members did so anyway.

Based on the information available to the Court at this point, therefore, the plaintiffs have shown a substantial likelihood of success on the merits of their

claim that the BLE deprived them of a meaningful vote in violation of the LMRDA.

## B. Separate Counting of the Canadian Votes and Dues Increase

■ Having found a substantial likelihood of success on the plaintiffs' first claim, the Court need only briefly address the argument that the separate counting of Canadian and American votes violates the plaintiffs' equal voting rights. The plaintiffs argue that, because it is widely known that Canadian members are far more likely to vote against the merger than American members, counting Canadian and American votes separately effectively dilutes the voice of American members voting against the merger. The defendants, on the other hand, rely heavily on two cases, *Amirault v. Shaughnessy*, 749 F.2d 140 (2d Cir.1984), and *Fulk v. United Transportation Union*, 81 F.3d 733 (7th Cir.1996), that approved vote-counting arrangements vaguely analogous to the one at issue here.

While it is true that the Second Circuit rejected the plaintiff union members' vote dilution argument in *Amirault*, the court specifically relied on the democratic nature of the voting, in which a national vote would determine whether the merger would go forward, but each member local would be disaffiliated if it disapproved of the merger. 749 F.2d at 145. In this case, the merger issue is not to be decided by the entire membership, but by two separate votes. Furthermore, the *Fulk* decision is readily distinguishable. In that case, the Seventh Circuit found that, as a statistical matter, splitting a general membership vote into smaller districts favors minority voters, but found that doing so was not "inherently discriminatory." 81 F.3d at 737. The court rejected the plaintiffs' assertion that this arrangement was

"a form of gerrymandering" that deprived them of an equal vote, but explicitly relied on the fact that the "objectionable aspect of gerrymandering—the attempt to define district boundaries so as to reduce the influence of a certain well-defined group of voters—[was] simply not present" in that case. *Id.* This was so because there was no evidence that the union knew in advance how various seniority districts were likely to vote on the issue. *Id.*

In this case, there is significant evidence that the Canadian BLE leadership was consistently skeptical of the merger, that this fact was generally well-known, and that the Canadian leadership ultimately passed a resolution to recommend that the membership vote no. *See* Pl. Factual Submissions in Supp. of Mot. for a Prelim. Inj., Exh. 15. ("Pl.Submission"). This resolution appears to have been passed after the ballots were sent out, but the plaintiffs have provided significant evidence that no one doubted serious resistance to the merger on the part of the Canadian membership. In fact, the unions themselves repeatedly assert that the separate vote was agreed upon so that the Canadian BLE would have the right to "separately determine their own destiny" by voting down the merger. Def. BLE's Mem. in Opp. to Pl.'s Application for a TRO and Mot. for a PI at 25 ("BLE Mem."); *see also* Dubroski Aff. at ¶ 64. This Court is troubled by the fact that the choice to count the Canadian BLE vote separately appears to have been based specifically on the expectation that the Canadian members would overwhelmingly vote against a merger. In this case, then, there is substantial evidence that there *is* a well-defined group of voters who could be disadvantaged by this arrangement: American BLE members opposing the merger. The vote-counting process in place in this case raises the specter of effectively siphoning off the largest portion

of votes expected to reject the merger, thereby diluting the voice of American members, like the plaintiffs, who oppose the merger.

■ Even if the arrangement deprives some members of "equal rights and privileges," however, there is no LMRDA violation if the inequality is due to "reasonable rules and regulations." *Fulk v. United Transportation Union,* 81 F.3d 733, 736 (7th Cir.1996). For this reason, the BLE further argues that the classification is reasonable because the interests of BLE members are quite different in the two countries. Namely, the NMB, which BLE leaders fear is poised to merge forcibly the two unions if a peaceful merger is rejected, has no jurisdiction over the Canadian members of the BLE. Thus, the concerns that led the American BLE leaders to urge adoption of the merger do not apply to the Canadian members, whose primary concern is preservation of their autonomy.

While these different concerns do provide some basis for the classification at issue here, the decision to count votes separately, where it could easily be inferred that doing so would dilute the voice of American members opposing the merger, rather than conducting a general membership referendum on the merger issue and allowing the Canadian members to disaffiliate if a majority of them disapproved the merger, is problematic. Counsel for the plaintiffs questioned this decision at the hearing on the plaintiffs' motion for a TRO and a PI, and the defendants have provided no evidence or argument suggesting that this choice was reasonable. Without any such evidence, the Court is faced with the troubling suggestion that the separate vote count was intended to increase the chances of passing the merger in the United States. Given this situation, the Court finds that the plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim that the separate vote count arrangement deprives them of their rights to an equal vote under the LMRDA.

The Court declines to assess the merit of the plaintiffs' claim that the separate vote count violates section 1(e) of the BLE constitution. No evidence has been presented to the Court regarding, for example, the past practice of interpreting the language of this section, particularly during merger referenda. Since this evidence is not yet available, and since the Court is not prepared to find that the plain language of this provision either allows or forbids the voting arrangement involved here, it would be premature for the Court to address the issue. Whether or not the arrangement violates the BLE constitution, the Court finds that the plaintiffs have shown a substantial likelihood of success on the claim that the arrangement violates the LMRDA. Furthermore, having found a substantial likelihood of success on the plaintiffs' first two claims, the Court declines to assess the plaintiffs' likelihood of success on their third claim, that the merger referendum constitutes a dues increase requiring voting by secret ballot under 29 U.S.C. § 411(a)(3)(B).

## C. Irreparable Harm, Harm to Others, and the Public Interest

■ The unions argue strenuously that the plaintiffs will not suffer actual and immediate irreparable harm if a TRO or a PI is not issued. The plaintiffs, they argue, will still have a remedy after the fact if the Court finds for them on the merits, since the Court could enjoin the merger any time before its January 1, 2002 effective date. Furthermore, the unions argue that they will suffer great harm if a TRO or a PI is granted, since the BLE convention is being held on September 24, 2001, and delegates, including the plaintiffs, are like-

ly to move to amend the BLE constitution to prohibit any merger with the UTU.

The plaintiffs argue that, if the TRO or a PI is not granted, "the political landscape within the BLE will be irreparably altered and the ability to conduct a second fair and democratic membership referendum will be totally undermined." Mem. in Supp. of Pl. Mot. for a Prelim. Inj. at 18 ("Pl.Mem."). The plaintiffs analogize to the effects of predictions during the United States presidential elections, when tallies of votes on the East Coast (three hours earlier) may influence voters on the West Coast, perhaps convincing some not to vote at all if their candidate appears to be losing. Furthermore, the plaintiffs argue, with reference to *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), that deprivation of voting rights constitutes *per se* irreparable harm.

The Court is not persuaded by the BLE's arguments that the plaintiffs' concerns are "speculative and based on assumptions that may or may not be true." BLE Mem. at 7. The plaintiffs' fear, expressed in their affidavits and supporting legal memoranda, that the deprivation of a meaningful and fair vote in this referendum has poisoned the electoral well is entirely rational. That this harm is intangible and perhaps unquantifiable does not make it any less actual or immediate. While the concentration of poison in the well may be a matter of speculation, one fact remains entirely clear and decidedly not hypothetical: Deprivation of equal voting rights in a union merger referendum that, if the merger is approved, will impact the day-to-day work lives of 39,000 BLE members is a serious matter. That the plaintiffs may get lucky and win the vote is of no consequence. The harm they suffer is the inclusion of their vote in a vote count that, having been tainted by irregularities in the referendum procedure, will not re-

flect the will of the plaintiffs, or, for that matter, any BLE members similarly deprived of an equal and informed vote. *Cf. Petrazzulo v. Lowen,* 534 F.Supp. 173, 176 (S.D.N.Y.1982) ("Irreparable harm will naturally flow to all union members who exercised their right to vote on the desegregation of assets without all pertinent financial information."). Whether or not deprivation of equal voting rights in the union context constitutes *per se* irreparable harm, it is clear in the circumstances of this case that the plaintiffs have raised serious concerns about the way in which this referendum was conducted and that, even if they do prove successful on the merits, the damage to their basic rights as union members under the LMRDA will have been extensive.

That the Court could conceivably enjoin the merger after the votes are tallied but before the effective date does not require a different result. Having found that the plaintiffs have shown a substantial likelihood of success on the merits, the Court, if it denies a TRO and a PI, despite the serious concerns raised about the referendum process and the substantial possibility that the result of that vote has been tainted by these irregularities, is faced with two possible scenarios. First, if the merger is rejected, then, despite counsel for the plaintiffs' suggestion that this case would go forward, this case is most likely mooted, since the unification agreement apparently becomes ineffective upon a vote rejecting merger. The unions suggest that, in this scenario, the plaintiffs would not suffer any harm at all. The Court rejects this reasoning, however, since the harm to the plaintiffs is the inclusion of their vote in a tally that does not accurately represent the total of the meaningful votes of BLE members. Whether or not that tally results in a merger, the plaintiffs' votes will have been included in the tainted count, resulting in a distortion of their political

voices. In the second scenario, the vote count could approve the merger. In that case, the harm to the plaintiffs is even clearer, since the leadership and the delegates at the upcoming BLE convention will have to begin preparing for the adjustment period following merger despite the substantial likelihood that the plaintiffs will succeed on the merits and that the referendum may therefore be invalid. The BLE's time and money will have to be spent preparing for a merger that may never go forward. Furthermore, much of the momentum the plaintiffs have gained as their message has gotten out would be diminished by a vote approving the merger, even if the vote later turns out to be invalid.

The defendants also argue that they will be greatly harmed by any grant of preliminary injunctive relief, and that the balance of hardships therefore favors them. The unions' main argument is that delegates to the upcoming BLE convention may amend section 1(e) of the BLE constitution to prevent any future merger with the UTU. Although this fear is somewhat hypothetical, it does not appear to be, as counsel for the plaintiffs suggested at the TRO/PI hearing, "pure, rank, and very convenient speculation." TRO Hr'g Tr. at 26. Indeed, the unions have presented evidence that the idea has at least been considered by members through a BLE e-mail list. *See* TRO Hr'g Tr., Def. Exh. A. Nonetheless, there is no reason to suspect that delegates are any more likely to amend the BLE constitution to forbid merger with the UTU than they are, if the vote count is allowed to go forward, to amend it to legitimize the referendum procedure at issue in this case. Finally, it is not at all clear to the Court why the delegates could not amend the constitution in the way the unions fear even if the votes were counted and the merger approved.

The new constitution would not be effective until January 1, 2002. Thus, any right of the delegates to amend the constitution to prohibit merger, whether or not that right actually exists under the BLE constitution, remains unchanged regardless of whether the votes are counted or not. It appears that whether the votes are counted or not has no bearing on the harm that the unions fear may come about. Granting a TRO or a PI while the merits of the dispute are considered in more detail would therefore cause no considerable harm to the unions.

Finally, the Court finds that the public interest clearly favors issuing a TRO or a PI. The policy underlying the LMRDA is well-established: "The clear policy of the act is to bid farewell to the regime of benevolent well-meaning union autocrats and to give favor to a system of union democracy with its concomitants of free choice and self-determination." *Blanchard v. Johnson*, 388 F.Supp. 208, 215 (N.D.Ohio 1974), *aff'd in relevant part*, 532 F.2d 1074 (6th Cir.1976). Given the paramount public policy interest in favor of seeing that union elections and referenda are run democratically, the Court finds that the public interest favors granting preliminary relief. This public interest is simply too threatened by allowing the final tally of votes to be announced in this case for the Court to deny the plaintiffs relief. Furthermore, the Court notes that the appearance of democracy is a crucial part of democracy itself. Whatever the result of the vote count, it would, if allowed to go forward, be shrouded by a veil of alleged improprieties and invalidity. If preliminary relief were denied, daily BLE business would have to proceed under the pall of perceived illegitimacy, a result inimical to the goals of union democracy and industrial peace. The Court also finds that, given the plaintiffs' likelihood of success on the merits, it is preferable to suspend counting until the merits of the case are

decided than to delegitimize a union referendum after the final vote count has taken place, the latter being a course more disruptive to union business and industrial relations as a whole.

## CONCLUSION

Since the plaintiffs have shown a substantial likelihood of success on the merits of two of their underlying claims, since the plaintiffs would suffer irreparable harm if the final vote count were announced, since the harm to other parties if preliminary relief is ordered is negligible, and since the public interest favors a grant of preliminary relief, the Court finds that all four factors favor the plaintiffs, and grants the plaintiffs' motion for a preliminary injunction.

Therefore, it is ordered that the defendants shall instruct the American Arbitration Association to impound all ballots cast by members of the BLE, to refrain from making the results of any ongoing or final tally of the votes known to any of the parties or to any third party, and to preserve the cast ballots under seal pending the resolution of this lawsuit.

IT IS SO ORDERED.